FREDERICKS v GENERAL MOTORS CORPORATION

OPINION OF THE COURT

1. NEGLIGENCE—NEGLIGENT ENTRUSTMENT—DEFECTIVE CHATTEL.

   The doctrine of negligent entrustment, while it has most often been applied in the cases where the chattel supplied has been classified as latently defective, or inherently dangerous, and where the party supplied is an infant or otherwise notoriously incompetent, is not necessarily so restricted in application; under the doctrine, the chattel need not be proved defective before recovery is permitted.

2. NEGLIGENCE—NEGLIGENT ENTRUSTMENT.

   The theory of negligent entrustment does not hinge on the nature of the chattel, but on the supply of the chattel to a probable negligent user.

3. NEGLIGENCE—PRIMA FACIE CASE—TRIAL—EVIDENCE.

   An allegation in a complaint that a defendant supplied a chattel to a party knowing the chattel would be used in a negligent manner states a cause of action, at least preliminarily, against a defendant for resulting injuries to others, and it was reversible error for the trial court in such an action to preclude the plaintiff by a grant of summary judgment from proving that the defendant knew in advance of its entrustment of the chattels to plaintiff's employer, that plaintiff's employer was a job shop that did not use care in its machine operations and that the chattels would be placed in an unsafe machine hazardous to its operators.

4. TRIAL—REQUESTS FOR ADMISSIONS—OPINIONS—COURT RULES.

   A trial court did not err in holding that the defendant need not respond to requests for admissions which sought not the admission or denial of facts, but instead sought the admission or

REFERENCES FOR POINTS IN HEADNOTES

[1–3, 5, 8] 57 Am Jur 2d, Negligence § 117 *et seq.*
[4] 53 Am Jur, Trial §§ 611–613, 1122.
[6, 7] 57 Am Jur 2d, Negligence §§ 24, 336.

denial of opinions or conclusions since the rule governing requests for admissions governs only requests for admissions of matters of fact (GCR 1963, 312.1).

DISSENT BY CHURCHILL, J.

5. NEGLIGENCE—CONTRACTS—BAILORS—NONDEFECTIVE CHATTELS.

*There is no authority for imposing liability on the supplier of a nondefective part for injuries sustained in working on an unguarded machine for which the part was supplied, where the part was on loan from the supplier to a manufacturer to produce goods for the supplier and was being used for that purpose at the time of the injury, even if it is assumed that the supplier-bailor's liability is at least coextensive with that of a seller, and that the injured plaintiff is entitled to the benefit of all favorable precedent in the law of warranty as well as in the law of negligence.*

6. NEGLIGENCE—INDEPENDENT CONTRACTOR—INHERENTLY DANGEROUS ACTIVITY—POWER PRESS.

*A general contractor is not liable for the negligent acts of an independent subcontractor, in the absence of the right of control, except when the work to be done is of such character that it necessarily subjects third persons to unusual danger; almost any power operation is dangerous if performed without any kind of guarding but the operation of a power press is not an inherently dangerous activity within the meaning of the exception to the rule.*

7. NEGLIGENCE—DUTY—EMPLOYEE SAFETY—INDEPENDENT CONTRACTOR.

*By statute the primary obligation to protect the employee is that of the employer, and mere knowledge of a defendant who contracts with an independent contractor that he intends to proceed in an unsafe manner, unless specifically required to do so by the defendant, does not create a cause of action in an employee of the independent contractor against the defendant (MCLA 408.852).*

8. NEGLIGENCE—NEGLIGENT ENTRUSTMENT—MACHINE PART.

*The negligent entrustment doctrine does not apply when the chattel entrusted is a part for a machine, and not a whole working machine.*

Appeal from Manistee, Charles A. Wickens, J.

Submitted Division 3 April 4, 1973, at Grand
Rapids. (Docket No. 14178.) Decided July 26, 1973.
Leave to appeal denied, 390 Mich —.

Complaint by Robert Fredericks against General
Motors Corporation for damages for personal inju-
ries. Summary judgment for defendant. Plaintiff
appeals. Reversed in part, affirmed in part, and
remanded for trial.

*McCroskey, Libner, Reamon, Williams, Van Leu-
ven & Klukowski* (by *J. Walter Brock*), for plain-
tiff.

*Cholette, Perkins & Buchanan* (by *Sherman H.
Cone*), for defendant.

Before: HOLBROOK, P. J., and T. M. BURNS and
CHURCHILL,* JJ.

HOLBROOK, P. J. The plaintiff was an employee of
Manistee Drop Forge Company in Filer City, Mich-
igan, on January 17, 1968. On this date he lost a
major part of his left hand while operating an
unguarded 100-ton power press during the course
of his employment. He brought an action to re-
cover damages from the defendant who owned the
dieset being used on the press at the time of the
accident. At the close of the opening statements,
the parties stipulated that the trial court take into
consideration all factual allegations from the
plaintiff's most favorable view and hear defend-
ant's motion for summary judgment. The court
granted the motion and plaintiff appealed.

The dies themselves were not manufactured by
the defendant, but had been used in a power press
at Lindell Drop Forge in Lansing, Michigan, to
manufacture parts for the defendant. When a

---

* Circuit judge, sitting on the Court of Appeals by assignment.

labor dispute closed Lindell, defendant acquired possession of the dies and negotiated a contract with Manistee Drop Forge to have parts manufactured by that company, under the arrangement that the latter would make such revisions in the dies as was necessary to adapt them to use on a press owned by Manistee Drop Forge.

The first issue raised on appeal is whether the trial court erred in finding as a matter of law that the defendant, as owner of the dies, had no "duty to warn or * * * duty to prescribe the method in which they are used, so that that duty flows through the subcontractor and to the user of those dies, in this case, the plaintiff".

We believe that defendant's motion for summary judgment was prematurely granted and therefore must reverse. We find that an allegation that a defendant supplied a chattel to a party knowing the chattel would be used in a negligent manner states a cause of action, at least preliminarily, against the defendant for injuries to others resulting from the party's negligence. Plaintiff alleges in paragraph 5(c) of his complaint that:

"The above mentioned negligence of the defendant consisted of the following acts and omissions, *inter alia:*

* * *

"Designing, manufacturing and installing said dies with the knowledge that said dies were not provided with the proper and adequate guards and safety devices which would enable said press machine and dies to be safely used for the intended purposes."

The party to whom the chattel is supplied is merely, according to such an allegation, an intervening foreseeable cause of the injuries to which the defendant may be responsible. Prosser, Torts (3d ed), § 51, Foreseeable Intervening Causes, pp

311–315. Such an allegation is at least analogous
to, if not a perfect example of, the doctrine of
negligent entrustment. The Restatement of Torts,
2d, § 390, p 314, states the rule:

"One who supplies directly or through a third person
a chattel for the use of another whom the supplier
knows or has reason to know to be likely because of his
youth, inexperience, or otherwise, to use it in a manner
involving unreasonable risk of physical harm to himself
and others whom the supplier should expect to share in
or be endangered by its use, is subject to liability for
physical harm resulting to them."

See, also, 2 Harper & James, The Law of Torts,
§ 28.2, p 1539. While the doctrine of negligent
entrustment most often has been applied in the
cases where the chattel supplied has been classi-
fied latently defective, or inherently dangerous,
and where the party supplied is an infant or
otherwise notoriously incompetent, the doctrine is
not necessarily so restricted in application. The
Restatement of Torts, 2d, *supra*, Comment (b), p
315, suggests:

"In the one case as in the other, liability is based
upon the rule, * * * that the actor may not assume
that human beings will conduct themselves properly if
the facts which are known or should be known to him
should make him realize that they are unlikely to do so.
Thus, one who supplies a chattel for the use of another
who knows its exact character and condition is not
entitled to assume that the other will use it safely if the
supplier knows or has reason to know that such other is
likely to use it dangerously, as where the other belongs
to a class which is notoriously incompetent to use the
chattel safely, *or lacks the training and experience
necessary for such use, or the supplier knows that the
other has on other occasions so acted that the supplier
should realize that the chattel is likely to be danger-
ously used, or that the other, though otherwise capable*

*of using the chattel safely, has a propensity or fixed
purpose to misuse it. This is true even though the
chattel is in perfect condition,* or though defective, is
capable of safe use for the purposes for which it is
supplied by an ordinary person who knows of its defec-
tive condition." (Emphasis supplied.)

Assuming that the dies themselves were not defec-
tive, the Restatement makes clear that the chattel
need not be proved defective before recovery is
permitted under the doctrine of negligent entrust-
ment. It is also irrelevant to the duty of due care
owed to others by one who supplies a chattel to a
party that the chattel transaction occurs as a gift,
sale, loan, lease, bailment, or what not. Harper &
James, *supra,* at p 1536.

While it may be true, in Michigan at least, that
the negligent entrustment doctrine has been used
primarily in motor vehicle cases (See, *e.g., Perin v
Peuler [On Rehearing],* 373 Mich 531, 537; 130
NW2d 4, 7–8 [1964]; *Kloosterman v Kalamazoo
City Lines Inc,* 21 Mich App 513; 175 NW2d 516
[1970], *aff'd* 386 Mich 430; 192 NW2d 258 [1971]),
the theory of negligent entrustment does not hinge
on the nature of the chattel, but on the supply of
the chattel to a probable negligent user. See, *e.g.,*
application of the doctrine in cases where a child
was supplied with firearms. 68 ALR2d 782. The
deposition of Jack C. Gerwin, Safety Director of
Saginaw Steering Gear, Division of General Mo-
tors Corporation, is instructive on this point, since
it is crucial to plaintiff's case that defendant had
knowledge of the unsafe operation of plaintiff's
employer's machines in which the dies could be
used:

"*Q. [Mr. Brock, plaintiff's attorney]:* And, a lot of the
job shops have operations set up which require their

operators to reach into the die areas and the zone of danger?

"*A.* I have seen this.

"*Q.* Seen this often enough that you are aware that this is a more or less standard way of proceeding in these small job shops?

"*A.* That's right. Let's face it, it cost money to guard presses.

"*Q.* And, most of the job shops do not have the money to hire engineers and safety directors?

"*A.* That's right, although in most of the job shops they have their own little boss who takes care of these little incidentals. The purchaser is buying, the safety director and engineer.

"*Q.* On this particular operation, did you gain the impression from Mr. Fredericks' deposition that the press was being activated with a single button?

"*A.* Yes, that's the impression I got from the deposition.

"*Q.* It was being fed with his hand?

"*A.* It was being fed with a right hand—let's see, no, the left hand; being retracted from the die with the right hand, and cycled with the right hand, so there was a great possibility of what happened to him, because he could load with his left hand and cycle with his right hand.

"*Q.* You, as a safety engineer observing this practice would immediately realize that the statistical probability of injury would be unacceptably high?

"*A.* It would be there, and eventually it would happen.

"*Q.* To you it would be unacceptable?

"*A.* That's right.

\*  \*  \*

"*Q.* And, looking at it as a safety engineer it would be a relatively—it appears it would be a relatively simple method to design a revolving die or sliding or progressive die for this operation?

"*A.* Not for a small outfit like Manistee Drop Forge. It would cost maybe forty thousand dollars to put that in.

"*Q.* Manistee Drop Forge would not have the economic capacity to design and manufacture such a die?

"*A.* Well, this is, in a way, it's the entire press, the whole sheet.

"*Q.* And, Manistee Drop Forge didn't have the economic power to develop such a system of operating?

"*A.* I wouldn't think so because they are basically a job shop, and they are doing this maybe three months, and then they have got a press sitting there they can't use, and they can't tie up their capital this way, so they are doing the job on a press they can do many many other things."

Plaintiff should be allowed, if able, to go on to prove beyond the deposition of Gerwin that the defendant knew in advance of its entrustment of the dies to Manistee Drop Forge that it was a job shop that did not use care in its machine operations, and that the dies would be placed in an unsafe machine hazardous to the operators thereof.

The second issue raised is whether the trial court erred in holding that the defendant did not need respond to requests for admissions which sought not the admission or denial of facts, but instead sought the admission or denial of opinions or conclusions. Plaintiff submitted requests for admissions to the defendant pursuant to GCR 1963, 312.1,[1] but the defendant objected to the requests because they related to opinions and conclusions as distinct from facts. The trial court agreed with the defendant, stating:

"Well, in this particular case, if the court looks at

[1] GCR 1963, 312.1 read in pertinent part as follows:

"Request for Admission. After commencement of an action a party may serve upon all other parties a written request for the admission by a designated party of the genuineness of any relevant documents described in and exhibited with the request or of the truth of any relevant *matters of fact* set forth in the request." (Emphasis supplied.)

[requests] 9 through 19 and the method in which it is framed, it looks like it is an attempt on the part of the plaintiff to box in the defendant as to what his conclusions may be at the trial. I think that for the court to require an answer to those questions would be in the nature of the court determining what the facts would be to come out at the trial. I think 9 through 19 is a conclusion which the jury would have to draw, factually, from those things which are presented to it in this case, and I think I agree with Mr. Gruel that 9 through 19 would not have to be answered and what facts will come out upon which the jury may decide conclusions as to what factually took place is a matter for the jury, and it need not be revealed at this time, but the facts will be best brought out at trial, and 9 through 19 need not be answered specifically on a denial bases."

The plaintiff argues that while GCR 1963, 312.1 reads that *matters of fact* are subject to requests for admission, the rule should be read broadly in order to effectuate the policies of the rule to limit areas of controversy and save time, energy, and expense which would otherwise be spent in proffering proof of matters properly subject to admission. The plaintiff cites FR Civ P, 36, the source of GCR 1963, 312.1, as analogous authority for the proposition that a party may be requested to admit opinions or the application of law to fact, as well as facts. However, FR Civ P, 36, was amended effective July 1, 1970, so as to allow requests to admit opinions.[2] Until that time the federal rule read as GCR 1963, 312.1 still reads, *i.e.,* to allow requests for admissions of matters of fact. While the policy behind the change in the federal rule may be

---

[2] FR Civ P, 36 now reads in pertinent part as follows:

"(a) *Request for admission.* A party may serve upon any other party a written request for the admission, for purposes of the pending action only, of the truth of any matters within the scope of Rule 26(b) set forth in the request that relate to statements or opinions of fact or of the application of law to fact, including the genuineness of any documents described in the request."

admirable, our court rule has not been changed, and therefore we are constrained to rule that the trial judge's interpretation of GCR 1963, 312.1, as it applied to plaintiff's request for admissions was correct.

Reversed in part, affirmed in part, and remanded for trial. No costs, neither party prevailing fully.

T. M. BURNS, J., concurred.

CHURCHILL, J. *(dissenting)*. I respectfully dissent.

An understanding of the issue requires an understanding of the interrelated functions of power presses and diesets. Power presses vary in complexity and design, but they have two basic parts, a bed and a ram. Dies are especially made to produce shaped manufactured parts. A dieset for a power press has two basic parts, an upper die and a lower die, which in use are attached to the ram and bed of the press. The workpiece, which is positioned between the two dies, is reformed into a desired shape when the ram, with the upper die attached, presses the workpiece against the lower die on the bed, much like the human arm cuts a cookie by pushing a cookie cutter down on the dough, pressing it onto the cutting board.

All machines with powered moving parts offer a hazard to people in close proximity. Power presses pose an obvious special threat to employees operating them, and to prevent the type of injury suffered by the plaintiff, all manner of guards and systems have been devised. Guards are sometimes attached to the press, and sometimes to the dies, and perhaps at times to both. The purpose of guards is to prevent any part of the human anatomy from being in the strike zone at the time the ram comes down. Safety systems may include

special controls and methods of feeding the work-piece into and out of the work zone other than by hand. Whether a press is permanently adapted to a particular operation, or whether it is used on different jobs from time to time, is a factor which influences safety methods actually used. In a given case the proper method of protecting a press oper-ator must be determined by persons with a knowl-edge of the press, the dies, and the manufacturing process. Cost factors may influence the method of providing safety actually employed.

The dies being used in the press at the time of plaintiff's injury were owned by General Motors. They had been used in a power press at Lindell Drop Forge of Lansing, Michigan, to manufacture General Motors parts under a contract with its Saginaw Steering Gear Division until a labor dis-pute closed the Lindell Drop Forge plant. General Motors acquired possession of the dies, negotiated a contract with Manistee Drop Forge to have parts manufactured by Manistee Drop Forge, and then shipped the dies to the new supplier. The arrange-ment between General Motors and Manistee Drop Forge was that the latter would make such revi-sions in the dies as necessary to adapt them to use on a press owned by Manistee Drop Forge.

Although the plaintiff did not plead that Gen-eral Motors knew that its supplier would operate a press without guards, he made a request for an admission of such a fact. In his opening statement he said, "We will show you that General Motors knew how these dies would be used and they knew that there was a danger in that method of using those dies". The trial judge in his opinion said, "Now, if the court views the plaintiff's position correctly, it is the position of the plaintiff in this case that the defendant, General Motors, knew the

method that Drop Forge was going to use to make these dies, that they knew also that this would be a dangerous operation". In his opening statement the defendant's attorney said that General Motors does not take any steps to tell its suppliers how to run their businesses, and that General Motors wants the part, and that the cheapest, the most economical, and the safest way to produce it is up to the suppliers. A factual issue as to the extent of General Motors' knowledge of Manistee Drop Forge's unsafe method of operation was framed.

Liability, if any, would be based on (1) the defendant's status as bailor of the die; (2) the defendant's status as a contracting purchaser of parts with knowledge of the supplier's manner of operation; or (3) the combination of these factors.

1. A press is a machine. A die is one of many parts for the machine. There is no allegation that the part itself was defective. Even if it is assumed that the bailor's liability[1] is at least coextensive with that of a seller, and that the plaintiff is entitled to the benefit of all favorable precedent in the law of warranty as well as in the law of negligence, there is no authority whatsoever for imposing liability on the supplier of a nondefective part for an unguarded machine.[2]

2. It is the general rule that a general contractor is not liable for the negligent acts of an independent subcontractor, in the absence of the right of control, except when the work to be done is of such character that it necessarily subjects third

[1] See 131 ALR 845; 46 ALR2d 404; also, Erickson v Soyars, 356 Mich 64; 95 NW2d 844 (1959).

[2] In Jennings v Tamaker Corp, 42 Mich App 310; 201 NW2d 654 (1972); Byrnes v Economic Machinery Co, 41 Mich App 192; 200 NW2d 104 (1972); Hill v Clark Equipment Co, 42 Mich App 405; 202 NW2d 530 (1972), and every other machine-guarding case cited the action was against the supplier of the working machine.

persons to unusual danger. *Barlow v Krieghoff Co,*
310 Mich 195; 16 NW2d 715 (1944); *Munson v
Vane-Stecker Co,* 347 Mich 377; 79 NW2d 855
(1956); *Dees v L F Largess Co,* 1 Mich App 421; 136
NW2d 715 (1965); *Mulcahy v Argo Steel Construc-
tion Co,* 4 Mich App 116; 144 NW2d 614 (1966);
*Royal v McNulty,* 17 Mich App 713; 170 NW2d 318
(1969); *Nemeth v Detroit Edison Co,* 26 Mich App
481; 182 NW2d 617 (1970); *Huntley v Motor Wheel
Corp,* 31 Mich App 385; 188 NW2d 5 (1971); *Funk
v General Motors Corp,* 37 Mich App 482; 194
NW2d 916 (1972), *leave to appeal granted* 387
Mich 764 (1972); *Kirner v General Motors Corp,* 41
Mich App 211; 199 NW2d 827 (1972).

Under the "inherently dangerous activity" the-
ory, the general contractor or employer is held
liable not for his own culpable negligence, but the
negligence of the independent contractor engaged
in an activity of such a character that it necessar-
ily subjects third persons to unusual danger. *Inglis
v Millersburg Driving Assn,* 169 Mich 311; 126
NW 413 (1912); *Mulcahy, supra; Huntley, supra.*
Almost any power operation is dangerous if per-
formed without any kind of guarding. In my opin-
ion, however, the operation of a power press is not
an inherently dangerous activity within the mean-
ing of the exception to the rule.

I find no case imposing or denying liability in
which there was knowledge or even an allegation
that the defendant had knowledge that the inde-
pendent contractor was going to proceed to per-
form a task, not inherently dangerous, in an un-
safe manner.

By statute the primary obligation to protect the
employee is that of the employer:

"Each employer shall establish and maintain condi-

tions of work which are reasonably safe and healthful for employees. Each employer's methods, processes, devices and safeguards, including methods of sanitation and hygiene, shall be such as are reasonably necessary to protect the life, health and safety of his employees." MCLA 408.852; MSA 17.49(2).

In my opinion the mere knowledge that the independent contractor intends to proceed in an unsafe manner, unless specifically required to do so by the defendant, does not create a cause of action.

3. Having concluded that neither ownership of a part used by a bailee thereof in an unsafely guarded machine, nor knowledge that the supplier intends to proceed in a negligent manner creates a cause of action, what then is the law if these two factors are combined?

Although the plaintiff's argument did not contain the words "negligent entrustment", there is a language in the Michigan case law which tends to support his cause of action on this theory:

> "There is another circumstance, however, where liability at common law is imposed upon the owner of a chattel for injuries resulting from its negligent use by another. Such liability arises when the owner permits an incompetent or inexperienced person to use his chattel with knowledge that such use is likely to cause injuries to others." *Haring v Myrick,* 368 Mich 420, 423; 118 NW2d 260, 261 (1962).

The "negligent entrustment" doctrine has been given no application except with respect to a motor vehicle. A motor vehicle, like a power press, is a whole working machine. Here we have an allegation of "negligent entrustment" of a part.

Whether we describe the issue in terms of vicarious liability, imputed negligence, or negligent en-

trustment, we are dealing with an important issue of first impression.

Allegations of knowledge about another business firm's operations are easy to make, easy to infer, and almost impossible to rebut. A rule such as contended for here will open a whole new area of litigation. If recovery is allowed in this case, it will mean that assembling manufacturers, like General Motors and many others, will be unable to permit their independent contract suppliers to use the purchaser's dies without exercising a substantial degree of control over the supplier's operations. The potential economic impact of such a rule is, at best, unpredictable.

Furthermore, if liability is to be imposed, it ought not to hinge on mere ownership of a part, which fact is not the keystone of the relationship between the plaintiff and the defendant, but rather on the fact that by making the contract, with or without the bailment of a part, the defendant knowingly puts into motion a dangerous industrial practice. Our system has devised other and more efficient means of reducing accidents and compensating employees who are injured.

For these reasons, I would affirm the trial court order dismissing the complaint.