MONING v ALFONO

Docket No. 55669. Argued May 6, 1975 (Calendar No. 1).—Decided
    June 15, 1977. Rehearing denied 401 Mich 951. For supplemen-
    tal order on rehearing see 402 Mich 958.

    Joseph Alfono, 11 years old, purchased two ten-cent slingshots
    from defendant Campbell Discount Jewelry. He gave one of the
    slingshots to the 12-year-old plaintiff, Royal Moning. Plaintiff
    was struck in the eye by a ricocheting projectile from Joseph's
    slingshot. The slingshot was manufactured by defendant Chem-
    ical Sundries Company (now Chemtoy Corporation) and distrib-
    uted by defendant King Tobacco and Grocery Co. Settlement
    was agreed upon between plaintiffs Royal Moning and his
    father, Ronald Moning, and defendants Joseph Alfono and his
    parents. The Wayne Circuit Court, Lysle G. Hall, J., directed a
    verdict in favor of the remaining defendants. The Court of
    Appeals, McGregor, P. J., and J. H. Gillis and O'Hara, JJ.,
    affirmed (Docket No. 14440). Plaintiffs appeal. *Held:*

        1. The manufacturer, the wholesaler, and the retailer of a
    manufactured product owe a legal obligation of due care to a
    bystander affected by use of the product, and whether the
    defendants, in violation of that obligation, created an unreason-
    able risk of harm in marketing slingshots directly to children is
    for a jury to decide, reasonable persons being of different
    minds.

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 63 Am Jur 2d, Products Liability §§ 144, 178, 180.
    Products liability: Extension of strict liability in tort to permit
    recovery by a third person who was neither a purchaser nor user
    of product. 33 ALR3d 415.
[2–9, 12, 14, 15, 17–21] 57 Am Jur 2d, Negligence §§ 69, 75, 89, 108 *et
    seq.,* 214, 215.
    63 Am Jur 2d, Products Liability §§ 31, 180.
    Liability of manufacturer or seller for injury caused by toys, games,
    athletic or sports equipment, or like products. 78 ALR2d 738.
[10] 57 Am Jur 2d, Negligence § 32.
[11, 13] 57 Am Jur 2d, Negligence § 67 *et seq.*
[13, 14] 57 Am Jur 2d, Negligence §§ 132, 133.
    63 Am Jur 2d, Products Liability § 22.
[16] 73 Am Jur 2d, Statutes § 342 *et seq.*
[20, 21] 57 Am Jur 2d, Negligence § 34.

2. The reasonableness of the risk of harm created because the slingshots were marketed directly to children turns on how the utility of the defendants' conduct is viewed in relation to the magnitude of the risk of harm. The resolution of the balance between the utility of children having ready-market access to slingshots and of the risk of harm created thereby should be decided by a jury. Reasonable persons can differ on the balance of utility and risk, and whether marketing slingshots directly to children creates an unreasonable risk of harm. The interest of children in ready-market access to slingshots is not so clearly entitled to absolute protection in comparison with the interest of persons who face the risk thereby created to warrant the Court in declaring, as a rule of common law, that the risk will be deemed to be reasonable.

3. The preference for jury resolution of the issue of negligence is not simply an expedient reflecting the difficulty of stating a rule that will readily resolve all cases. Rather, it is rooted in the belief that the jury's judgment of what is reasonable under the circumstances of a particular case is more likely than the judicial judgment to represent the community's judgment of how reasonable persons would conduct themselves. If the experience should be that juries invariably reach one result, that may suggest the specific standard of care upon which "all" reasonable persons would agree. Until the *community* judgment is made so to appear, the principle that doubtful questions regarding the application of the standard of care should be decided by reference to the community judgment requires submission to the jury of the question so in doubt.

4. The law of negligence was created by common-law judges and, therefore, it is unavoidably the Court's responsibility to continue to develop or limit the development of that body of law, absent legislative directive. The Legislature has not approved or disapproved the manufacture of slingshots and their marketing directly to children; the Court perforce must decide what the common-law rule shall be.

5. A manufacturer, wholesaler and retailer of slingshots can be expected to foresee that they will be used to propel pellets and that a person within range may be struck. Moning, as a playmate of a child who purchased a slingshot marketed by the defendants, was within the foreseeable scope of the risk created by their conduct in marketing slingshots directly to children. Alfono's shooting pellets toward a tree and a ricochet into Moning's eye was within the recognizable risk of harm created by marketing slingshots directly to children as a normal consequence of the situation created by the defendants' conduct.

6. A person who supplies an article to a child which may pose a reasonable risk of harm in the hands of an adult but which poses an unreasonable risk of harm in the hands of a child is subject to liability for resulting harm. The doctrine of negligent entrustment is grounded in the general principle that a reasonable person will have in mind the immaturity, inexperience and carelessness of children. Entrusting potentially dangerous articles to a child may pose an unreasonable risk of harm not only because the child may not appreciate the risk or may not have the skill to use the article safely but—even if he does appreciate the risk and does have the requisite skill—because he may recklessly ignore the risk and use the article frivolously due to immaturity of judgment, exuberance of spirit, or bravado. If, taking those traits into account, a reasonable person would recognize that his conduct involves a risk of creating an invasion of the child's or some other person's interest, he is required to recognize that his conduct does involve such a risk.

7. It is apparent from the legislation in other states and innumerable municipalities that all reasonable persons do not agree that marketing slingshots directly to children does not involve an unreasonable risk of harm. The failure of other states and cities to enact like statutes and ordinances, and of the Legislature either to authorize or prohibit the marketing of slingshots directly to children, indicates a variety of opinion, but not a consensus, regarding the reasonableness of marketing slingshots directly to children. Since reasonable persons can differ regarding the balance of risk and utility (the reasonableness of the risk of harm) and since there is no overriding policy based on social utility of maintaining absolute access to slingshots by children, the decision of the Court of Appeals is reversed and the cause is remanded for a new trial.

Justice Fitzgerald, joined by Justice Coleman, dissented. He wrote:

1. The question of duty is to be resolved by the court rather than the jury and is reviewed as a question of law.

2. The Restatement of Torts states the doctrine that a supplier of a chattel to one who he has reason to know is likely to misuse it is liable to those foreseeably injured by the misuse. The reason to know arises from a knowledge of the circumstances concerning the individual supplied. Plaintiffs seek to extend the doctrine to recognize the status of children, rather than the circumstances of the individual child, and would circumscribe with duty the distribution of toys whose misuse involves a likelihood of injury. Such an extension is a legislative task.

3. In the absence of legislative prescription circumscribing the manufacture, distribution, or sale of slingshots or providing that defendants insure against the misuse of their products, no duty can be found upon which the liability of defendants may be premised.

OPINION OF THE COURT

1. PRODUCTS LIABILITY—NEGLIGENCE—DUTY OF CARE—BYSTANDERS.

The manufacturer, the wholesaler, and the retailer of a manufactured product owe a legal obligation of due care to a bystander affected by use of the product.

2. PRODUCTS LIABILITY—NEGLIGENCE—RISK OF HARM—SLINGSHOTS—JURY QUESTION.

Reasonable persons being of different minds, it is for a jury to decide whether a manufacturer, a wholesaler, and a retailer created an unreasonable risk of harm in marketing slingshots directly to children.

3. NEGLIGENCE—RISK OF HARM—REASONABLENESS.

Negligence is conduct involving an unreasonable risk of harm; unreasonableness turns on how the utility of the defendant's conduct is viewed in relation to the magnitude of the risk.

4. PRODUCTS LIABILITY—NEGLIGENCE—SLINGSHOTS—JURY QUESTION.

The resolution of the balance between the utility of children having ready-market access to slingshots and the risk of harm thereby created is an aspect of the determination of the reasonableness of that risk and of the conduct of a manufacturer, a wholesaler and a retailer of slingshots in marketing them directly to children, and should be decided by a jury.

5. PRODUCTS LIABILITY—NEGLIGENCE—SLINGSHOTS—JURY QUESTION—COMMON LAW.

The interest of children in ready-market access to slingshots is not so clearly entitled to absolute protection in comparison with the interest of persons who face the risk thereby created as to warrant the Supreme Court in declaring, as a rule of common law, that the risk will be deemed to be unreasonable.

6. PRODUCTS LIABILITY—NEGLIGENCE—SLINGSHOTS—JURY QUESTION.

A jury, applying the community's judgment of how reasonable persons would conduct themselves, should make the ultimate value judgment of the risks and the societal importance of the interests involved in marketing slingshots directly to children.

7. NEGLIGENCE—JURY QUESTION—QUESTION OF LAW—REASONABLE-
   NESS.

   The preference for jury resolution of the issue of negligence is not
   simply an expedient reflecting the difficulty of stating a rule
   that will readily resolve all cases; rather, it is rooted in the
   belief that the jury's judgment of what is reasonable under the
   circumstances of a particular case is more likely than the
   judicial judgment to represent the community's judgment of
   how reasonable persons would conduct themselves.

8. NEGLIGENCE—STANDARD OF CARE—JURY QUESTION.

   The principle that doubtful questions regarding the application of
   the standard of care should be decided by reference to the
   community judgment requires submission to the jury of the
   question so in doubt until the experience is that juries invari-
   ably reach one result, which then suggests that the *community*
   judgment on the specific standard of care is one upon which
   "all" reasonable persons would agree.

9. NEGLIGENCE—PRODUCTS LIABILITY—SLINGSHOTS—COMMON LAW.

   The law of negligence was created by common-law judges and,
   therefore, it is unavoidably the Supreme Court's responsibility
   to continue to develop or to limit the development of that body
   of law absent legislative directive; the Legislature has not
   approved or disapproved the manufacture of slingshots and
   their marketing directly to children, and therefore the Court
   must decide what the common-law rule shall be.

10. NEGLIGENCE—ELEMENTS OF ACTION.

    The elements of an action for negligence are (1) duty, (2) general
    standard of care, (3) specific standard of care, (4) cause in fact,
    (5) legal or proximate cause, and (6) damages.

11. NEGLIGENCE—WORDS AND PHRASES—DUTY.

    "Duty" in an action for negligence comprehends whether the
    defendant is under *any* obligation to the plaintiff to avoid
    negligent conduct; it does not include—where there is an
    obligation—the nature of the obligation: the general standard
    of care and the specific standard of care.

12. NEGLIGENCE—QUESTION OF LAW—JURY QUESTION.

    While the court in an action for negligence decides questions of
    duty, general standard of care and proximate cause, the jury
    decides whether there is cause in fact and the specific standard
    of care: whether the defendant's conduct is below the general
    standard of care, including—unless the court is of the opinion
    that all reasonable persons would agree or there is an overrid-

ing legislatively or judicially declared public policy—whether in the particular case the risk of harm created by the defendant's conduct is reasonable.

13. Negligence—Words and Phrases—Duty—Proximate Cause.

Duty, in an action for negligence, is essentially a question of whether the relationship between the actor and the injured person gives rise to any legal obligation on the actor's part for the benefit of the injured person; proximate cause encompasses a number of distinct problems including the limits of liability for foreseeable consequences.

14. Products Liability—Negligence—Slingshots—Foreseeable Consequences.

A manufacturer, a wholesaler and a retailer of slingshots can be expected to foresee that they will be used to propel pellets and that a person within range may be struck; a minor plaintiff in an action for negligence, as a playmate of a child who purchased a slingshot marketed by the defendants, was within the foreseeable scope of the risk created by their conduct in marketing slingshots directly to children and the shooting of pellets which ricocheted into the plaintiff's eye was within the recognizable risk of harm created by the defendants.

15. Negligence—Risk of Harm—Children—Negligent Entrustment.

A person who supplies an article to a child which may pose a reasonable risk of harm in the hands of an adult but which poses an unreasonable risk of harm in the hands of a child is subject to liability for resulting harm; the doctrine of negligent entrustment is grounded in the general principle that a reasonable person will have in mind the immaturity, inexperience and carelessness of children.

16. Common Law—Statutes.

Statutes and other legislative judgments may themselves be a source of common law; the policy thus established has become itself a part of our law, to be given appropriate weight not only in matters of statutory construction but also in those of decisional law.

17. Products Liability—Negligence—Slingshots—Risk of Harm—Reasonableness—Statutes—Ordinances.

It is apparent from the legislation in other states and in innumerable municipalities that all reasonable persons do not agree that marketing slingshots directly to children does not involve an unreasonable risk of harm; the failure of other states and

cities to enact like statutes and ordinances, and of the Legislature either to authorize or prohibit the marketing of slingshots directly to children, indicates a variety of opinion, but not a consensus regarding the reasonableness of marketing slingshots directly to children.

18. PRODUCTS LIABILITY—NEGLIGENCE—SLINGSHOTS—RISK OF HARM—REASONABLENESS.

There is not a sufficient basis for concluding as a matter of law that the utility of marketing slingshots directly to children outweighs the risk of harm thereby created.

DISSENTING OPINION BY FITZGERALD, J.

COLEMAN, J.

19. PRODUCTS LIABILITY—NEGLIGENCE—DUTY—SLINGSHOTS—DISTRIBUTORS—DIRECTED VERDICT.

*A directed verdict in favor of the manufacturer, wholesaler, and retailers of a slingshot, in an action against them by a minor to recover for injuries sustained as a result of use of the slingshot by another minor, was proper; the defendants did not owe the plaintiff an asserted duty not to manufacture, distribute and sell slingshots.*

20. NEGLIGENCE—DUTY—QUESTION OF LAW.

*The question of duty, in a negligence case, is to be resolved by a court rather than a jury, and is reviewed as a question of law.*

21. PRODUCTS LIABILITY—NEGLIGENCE—DUTY—SLINGSHOTS:

*In the absence of legislative prescription circumscribing the manufacture, distribution, or sale of slingshots or providing that the manufacturer, distributor, or seller insure against the misuse of their products, no duty can be found upon which their liability may be premised in a case where a minor was struck in the eye by a projectile from another minor's slingshot.*

*Milan & Miller* and *Zeff & Zeff (Edward Grebs,* of counsel) for plaintiffs.

*Garan, Lucow, Miller, Lehman, Seward & Cooper* (by *Albert A. Miller)* for the Alfonos.

*Edward Sanders* for defendant Georgette Campbell.

*Richard B. Kramer* for defendant King Tobacco and Grocery Company.

*Robert E. Fox* for Chemtoy Corporation, formerly Chemical Sundries Company.

LEVIN, J. Royal Moning, when he was 12 years old, lost the sight of an eye which was struck by a pellet fired from a slingshot being used by his 11-year-old playmate, Joseph Alfono.

There was evidence that Alfono purchased two 10¢-slingshots from defendant Campbell Discount Jewelry and had given one to Moning, and that the slingshots had been manufactured by defendant Chemtoy Corporation and distributed by defendant King Tobacco and Grocery Company.

Moning claims that it is negligence to market slingshots directly to children, and that the manufacturer, wholesaler and retailer are subject to liability.

The claim against the Alfonos was settled. Upon completion of Moning's proofs, the trial judge directed a verdict for the remaining defendants. The Court of Appeals affirmed.

We remand for a new trial because a manufacturer, wholesaler and retailer of a manufactured product owe a legal obligation of due care to a bystander affected by use of the product, and whether defendants in violation of that obligation created an unreasonable risk of harm in marketing slingshots directly to children is for a jury to decide, reasonable persons being of different minds.

My colleague declares that there is no legal duty to refrain from manufacturing slingshots for and marketing them directly to children.

It obscures the separate issues in a negligence

case (duty, proximate cause and general and specific standard of care) to combine and state them together in terms of whether there is a duty to refrain from particular conduct.

It is now established that the manufacturer and wholesaler of a product, by marketing it, owe a legal duty to those affected by its use. The duty of a retailer to a customer with whom he directly deals was well established long before the manufacturer and wholesaler were held to be so obligated. The scope of their duty now also extends to a bystander. All the defendants were, therefore, under an "obligation for the safety"[1] of Moning; they owed him a duty to avoid conduct that was negligent.

Whether it would be a violation of that obligation to market slingshots directly to children is not a question of duty, but of the specific standard of care: the reasonableness of the risk of harm thereby created.

Negligence is conduct involving an *unreasonable* risk of harm.

Slingshots pose a *risk* of harm. In manufacturing and marketing slingshots the defendants necessarily created such a risk.

The meritorious issues are whether the risk so created was unreasonable because the slingshots were marketed directly to children, and whether this should be decided by the court or by the jury.

The reasonableness of the risk of harm, whether analyzed or expressed in terms of duty, proximate cause or the specific standard of care, and whether regarded as one of law or fact or for the court or the jury to decide, turns on how the utility of the

[1] *See* Prosser, Torts (4th ed), § 37, p 206, quoted in my colleague's opinion.

defendants' conduct is viewed in relation to the magnitude of the risk.

If a court is of the opinion that marketing slingshots directly to children is of such utility that it should be fully protected, the court in effect determines as a matter of law that the risk of harm so created is not unreasonable and, therefore, such conduct is not negligent.

The resolution of the balance between the utility of children having ready-market access to slingshots and the risk of harm thereby created is an aspect of the determination of the reasonableness of that risk and of the defendants' conduct, and should be decided by a jury:

—Reasonable persons can differ on the balance of utility and risk, and whether marketing slingshots directly to children creates an unreasonable risk of harm;

—The interest of children in ready-market access to slingshots is not so clearly entitled to absolute protection in comparison with the interest of persons who face the risk thereby created as to warrant the Court in declaring, as a rule of common law, that the risk will be deemed to be reasonable.

The statement that "we are being asked to perform a legislative task" because a holding for Moning "would in effect be making a value judgment and saying * * * [that slingshots] should not be *manufactured or marketed"* (emphasis supplied) to children assumes that allowing juries to decide the reasonableness of the risk of harm created by *marketing* slingshots directly to children will so burden the manufacture and marketing of slingshots that all manufacturing and marketing would cease, rather than merely affect the manner and cost of marketing slingshots, and does not take

into account that however the Court decides the case it in effect makes a value judgment:

—Affirming a directed verdict for the defendants in effect expresses a value judgment that the interest of the child in ready-market access to slingshots is of such societal importance that as a matter of law it takes precedence over the interest in protecting persons exposed to the risk of harm so created, or that all reasonable persons would agree that the risk so created is not unreasonable.

—Reversing the directed verdict and holding that the issue should be decided by a jury is not an expression of a value judgment that slingshots should not be manufactured and marketed, but rather expresses a value judgment that all reasonable persons do not agree concerning the reasonableness of the risk so created and that the interest of the child in ready-market access is not of such overriding importance as to be entitled to absolute protection as a matter of law, and therefore a jury, applying the community's judgment of how reasonable persons would conduct themselves, should make the ultimate value judgment of the risks and the societal importance of the interests involved in marketing slingshots directly to children.

However the Court decides this case, it necessarily makes a choice, even if the Legislature may later make a different choice.

If the issue is left to juries to decide, different juries will, indeed, reach different results, sometimes in cases appearing to be factually indistinguishable. The variant results may be more perceptible in this kind of case than in one where it may appear there are more variables. The preference for jury resolution of the issue of negligence is not, however, simply an expedient reflecting the difficulty of stating a rule that will readily resolve

all cases; rather, it is rooted in the belief that the jury's judgment of what is reasonable under the circumstances of a particular case is more likely than the judicial judgment to represent the community's judgment of how reasonable persons would conduct themselves.[2]

If the experience should be that juries invariably reach one result, that may suggest the specific standard of care upon which "all" reasonable persons would agree.[3] Until the *community* judgment is made so to appear, the principle that doubtful questions regarding the application of the standard of care should be decided by reference to the community judgment requires jury submission of the question so in doubt.

The law of negligence was created by common-law judges and, therefore, it is unavoidably the Court's responsibility to continue to develop or limit the development of that body of law *absent* legislative directive. The Legislature has not approved or disapproved the manufacture of slingshots and their marketing directly to children; the Court perforce must decide what the common-law rule shall be.

I

## DUTY AND PROXIMATE CAUSE

While we all agree that the duty question is

---

[2] "The reasonable man represents the general level of community intelligence and perception and the jury, being a cross-section of the community, should best be able to tell what that general level is." 2 Harper & James, The Law of Torts, § 16.10, p 936. *Similarly see,* Prosser, *supra,* § 37, p 207; *Detroit & M R Co v Van Steinburg,* 17 Mich 99, 120 (1868).

[3] *See* Prosser, *supra,* § 35, p 188; 2 Harper & James, *supra,* § 17.2, p 971.

solely for the court to decide,[4] the specific standard of care is not part of that question.

The elements of an action for negligence are (i) duty, (ii) general standard of care, (iii) specific standard of care, (iv) cause in fact, (v) legal or proximate cause, and (vi) damage.

"Duty" comprehends whether the defendant is under *any* obligation to the plaintiff to avoid negligent conduct; it does not include—where there is *an* obligation—the nature of the obligation: the general standard of care and the specific standard of care.

Dean Prosser observed:

"It is quite possible, and not at all uncommon, to deal with most of the questions which arise in a negligence case in terms of 'duty.' Thus the standard of conduct required of the individual may be expressed by saying that the driver of an automobile approaching an intersection is under a duty to moderate his speed, to keep a proper lookout, or to blow his horn, but that he is not under a duty to take precautions against the unexpected explosion of a manhole cover in the street. But the problems of 'duty' are sufficiently complex without subdividing it in this manner to cover an endless series of details of conduct. *It is better to reserve 'duty' for the problem of the relation between individuals which imposes upon one a legal obligation for the benefit of the other,* and to deal with particular conduct in terms of a legal standard of what is required to meet the obligation. In other words, 'duty' is a question of whether the defendant is under *any* obligation for the benefit of the particular plaintiff; and in negligence cases, the duty is always the same, to conform to the legal standard of reasonable conduct in the light of the apparent risk. *What the defendant must do, or must not do, is a question of the standard of conduct required to satisfy*

---

[4] *See* Prosser, *supra*, § 37, p 206. *See, also, Elbert v Saginaw,* 363 Mich 463, 476; 109 NW2d 879 (1961).

*the duty."* Prosser, Torts (4th ed), § 53, p 324 (emphasis supplied).

The statement in my colleague's opinion that the "defendants did not owe plaintiff minor the asserted duty not to manufacture, distribute and sell slingshots" combines the separate questions of duty, general and specific standard of care and proximate cause: whether in marketing a product a manufacturer, wholesaler and retailer are under any legal obligation to a bystander (duty); the nature of that obligation (general standard of care: reasonable conduct "in the light of the apparent risk"); whether marketing slingshots directly to children is reasonable conduct (specific standard of care); whether marketing slingshots directly to children is "so significant and important a cause [of loss resulting from such marketing] that the defendant should be legally responsible"[5] (proximate cause, a policy question often indistinguishable from the duty question).

Combining in one statement these different questions obscures the functions of the court and jury. While the court decides questions of duty, general standard of care and proximate cause, the jury decides whether there is cause in fact and the specific standard of care:[6] whether defendants' conduct in the particular case is below the general standard of care, including—unless the court is of the opinion that all reasonable persons would agree or there is an overriding legislatively or judicially declared public policy—whether in the particular case the risk of harm created by the defendants' conduct is or is not reasonable.

Duty is essentially a question of whether the

[5] Prosser, *supra*, § 42, p 244.

[6] *Id*, § 45, pp 289–290; § 37, pp 205–208.

relationship[7] between the actor and the injured
person gives rise to any legal obligation on the
actor's part for the benefit of the injured person.
Proximate cause encompasses a number of distinct
problems including the limits of liability for fore-
seeable consequences.[8] In the *Palsgraf*[9] case, the
New York Court of Appeals, combining the ques-
tions of duty and proximate cause,[10] concluded that
no duty is owed to an unforeseeable plaintiff.

The questions of duty and proximate cause are
interrelated because the question whether there is
the requisite relationship, giving rise to a duty,
and the question whether the cause is so signifi-
cant and important to be regarded a proximate
cause both depend in part on foreseeability—
whether it is foreseeable that the actor's conduct
may create a risk of harm to the victim, and
whether the result of that conduct and intervening
causes were foreseeable.

It is well established that placing a product on
the market creates the requisite relationship be-
tween a manufacturer, wholesaler and retailer and
persons affected by use of the product giving rise
to a legal obligation or duty to the persons so
affected. A manufacturer owes the consumer an
obligation to avoid negligent conduct.[11] The obliga-
tion extends to persons within the foreseeable
scope of the risk. In *Piercefield v Remington Arms
Co, Inc,* 375 Mich 85; 133 NW2d 129 (1965), a
bystander, injured when his brother's shotgun bar-

[7] *Id,* § 42, p 244; *Clark v Dalman,* 379 Mich 251, 260; 150 NW2d 755 (1967).

[8] *See generally,* H. L. A. Hart & A. M. Honoré, Causation in the Law (Oxford, Clarendon Press, 1973), ch IX.

[9] *Palsgraf v Long Island R Co,* 248 NY 339; 162 NE 99; 59 ALR 1258 (1928).

[10] Prosser, *supra,* § 43, p 254.

[11] *MacPherson v Buick Motor Co,* 217 NY 382; 111 NE 1050 (1916).

rel exploded, was permitted to maintain an action against the manufacturer, wholesaler and retailer of allegedly defective shotgun shells.[12]

A manufacturer, wholesaler and retailer of slingshots can be expected to foresee that they will be used to propel pellets and that a person within range may be struck. Moning, as a playmate of a child who purchased a slingshot marketed by the defendants, was within the foreseeable scope of the risk created by their conduct in marketing slingshots directly to children. Moning was a foreseeable plaintiff. The defendant manufacturer, wholesaler and retailer were under an obligation for the safety of Moning.

The question of proximate cause, like the question of duty, is "essentially a problem of law".[13]

---

[12] "Agreeing as all of our recent decisions do with the developing weight of authority, the essence of which is that the manufacturer is best able to control dangers arising from defects of manufacture, I would say definitely that *Spence v Three Rivers Builders & Masonry Supply, Inc,* 353 Mich 120 [90 NW2d 873 (1958)]; *Manzoni v Detroit Coca-Cola Bottling Co,* 363 Mich 235 [109 NW2d 918 (1961)]; *Barefield v La Salle Coca-Cola Bottling Co,* 370 Mich 1 [120 NW2d 786 (1963)], and *Hill v Harbor Steel & Supply Corp,* 374 Mich 194 [132 NW2d 54 (1965)], have put an end in Michigan to the defense of no privity, certainly so far as concerns an innocent bystander injured as this plaintiff pleads, and that a person thus injured should have a right of action against the manufacturer on the theory of breach of warranty *as well as upon the theory of negligence." Piercefield v Remington Arms Co, Inc,* 375 Mich 85, 97–98; 133 NW2d 129 (1965) (emphasis supplied).

[13] Prosser, *supra,* § 42, p 244.

"[I]t is possible to approach 'proximate cause' as a series of distinct problems, more or less unrelated, to be determined upon different considerations. The list, which is not necessarily exclusive, would include at least the following problems:

"1. The problem of causation in fact * * * .

"2. The problem of apportionment of damages among causes.

* * *

"3. The problem of liability for unforeseeable consequences * * * .

"4. The problem of intervening causes * * * .

"5. The problem of shifting responsibility * * * ." *Id,* pp 249–250.

Most proximate cause problems are not involved in this case.[14]

Alfono's conduct in using the slingshot to propel pellets was to be anticipated. "If the intervening cause is one which in ordinary human experience is reasonably to be anticipated, or one which the defendant has reason to anticipate under the particular circumstances, he may be negligent, among other reasons, because he has failed to guard against it; or he may be negligent only for that reason." Prosser, *supra,* § 44, p 272.

By marketing slingshots directly to children, the defendants effectively created the risk that Alfono would use the slingshot. "Obviously the defendant cannot be relieved from liability by the fact that the risk, or a substantial and important part of the risk, to which he has subjected the plaintiff has indeed come to pass. Foreseeable intervening forces are within the scope of the original risk, and hence of the defendant's negligence. The courts are quite generally agreed that intervening causes which fall fairly in this category will not supersede the defendant's responsibility." *Id,* p 273.[15]

Alfono's shooting pellets toward a tree and a

---

[14] *See* fn 13, *supra;* there is no issue of apportionment of damages, or of shifting responsibility to another person except insofar as defendants similarly situated might be free to leave the duty of protecting a person affected by a child's use of a slingshot to adults were they to market slingshots in a manner designed to reach adults and not children; the issue of causation in fact is for a jury to resolve.

[15] The Restatement illustrates the scope of the responsibility for delivering a potentially dangerous chattel to a child:

"A gives a loaded pistol to B, a boy of eight, to carry to C. In handing the pistol to C the boy drops it, injuring the bare foot of D, his comrade. The fall discharges the pistol, wounding C. A is subject to liability to C, but not to D." 2 Restatement Torts, 2d, § 281, illustration to comment f on clause (b).

"If a gun is entrusted to a child, it suggests at once to anyone with imagination at all that someone, the child or another, is likely to be shot." Prosser, *supra,* § 44, p 273.

ricochet into Moning's eye was within the "recognizable risk of harm" created by marketing slingshots directly to children.[16]

The ricochet was "a normal consequence of the situation" created by the defendants' conduct.[17]

## II

### GENERAL STANDARD OF CARE
### SPECIFIC STANDARD OF CARE

Turning to a consideration of the nature of the obligation owed by a manufacturer, wholesaler or retailer, we note that this is not an ordinary

---

[16] 2 Restatement, *supra,* § 281, comment f on clause (b).

"So far as scope of duty (or, as some courts put it, the relation of proximate cause) is concerned, it should make no difference whether the intervening actor is negligent or intentional or criminal. Even criminal conduct by others is often reasonably to be anticipated. After all, if I leave a borrowed car on the streets of New York or Chicago with doors unlocked and key in ignition, I am negligent (at least towards the owner) because of the very likelihood of theft. And if I lend a car to one known by me to be habitually careless I am negligent precisely because of the likelihood of his negligent operation of the car. Again the importance of the factor of foreseeability is not altered if the intervening act is that of plaintiff himself, nor is it if that act is a negligent one. When I lent my car to the careless driver, one of the risks that made me negligent was surely the chance that he might hurt himself. If he is barred from recovery for such hurt it is because of his contributory fault, not for want of a causal connection or because he is beyond the scope of my duty." 2 Harper & James, *supra,* § 20.5, pp 1144–1146.

*Similarly see Comstock v General Motors Corp,* 358 Mich 163, 179; 99 NW2d 627; 78 ALR2d 449 (1959); *Berry v Visser,* 354 Mich 38, 47; 92 NW2d 1 (1958).

[17] "The intervention of a force which is a normal consequence of a situation created by the actor's negligent conduct is not a superseding cause of harm which such conduct has been a substantial factor in bringing about." 2 Restatement, *supra,* § 443.

"The word 'normal' is not used in this Section in the sense of what is usual, customary, foreseeable, or to be expected. It denotes rather the antithesis of abnormal, of extraordinary. It means that the court or jury, looking at the matter after the event, and therefore knowing the situation which existed when the new force intervened, does not regard its intervention as so extraordinary as to fall. outside of the class of normal events." *Id,* comment b.

products liability case where the plaintiff seeks to recover by proving a defect in the product without carrying the burden of proving fault or negligence. Moning's claim is grounded in negligence. He asserts that his damage was caused by the fault of the defendants.

In a negligence case, the standard of conduct is reasonable or due care. 2 The Restatement Torts, 2d, § 283, provides: "[T]he standard of conduct to which [the actor] must conform to avoid being negligent is that of a reasonable man under like circumstances." "[I]n negligence cases, the duty is always the same, to conform to the legal standard of reasonable conduct in the light of the apparent risk." Prosser, Torts, *supra,* § 53, p 324.

It is the application of that general standard of conduct to the marketing of slingshots to children, the specific standard of care—not whether there is a duty of due care in such marketing—that is the primary area of disagreement in this case.

Manufacturing and marketing slingshots necessarily creates a risk of harm. Moning does not, however, contend that manufacturing and marketing slingshots is negligence *per se.* His contention, rather, is that marketing them *directly to children* creates an unreasonable risk of harm.

Moning relies on the doctrine of negligent entrustment, one of the many specific rules concerning particular conduct that have evolved in the application of the general standard of care. A person who supplies an article to a child which may pose a reasonable risk of harm in the hands of an adult but which poses an unreasonable risk of harm in the hands of a child is subject to liability for resulting harm:

"One who supplies directly or through a third person

a chattel for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them." 2 Restatement Torts, 2d, § 390.[18]

The common law has long recognized that a parent or other responsible adult who entrusts a potentially dangerous instrumentality to a child may be subject to liability.[19] Liability "arises from [the defendant's] active misconduct; he has actually created an unreasonable risk to others by placing a chattel in the hands of a person whose use thereof is likely to create a recognizable risk to third persons".[20]

The obligation "to guard or secure objects which are dangerous to children" arises "because of the likelihood of their own intermeddling".[21] Persons dealing with children must "take notice of the ordinary nature of young boys, their tendency to do mischievous acts, and their propensity to meddle with anything that came in their way".[22]

---

[18] The doctrine is not limited to plaintiffs whose "individual" propensities are known to the supplier. The comments following 2 Restatement, *supra*, § 390, show that the doctrine of negligent entrustment also applies to *classes* of persons. 2 Restatement, *supra*, § 390, comment b.

[19] *See,* Harper & Kime, *The Duty to Control the Conduct of Another,* 43 Yale LJ 886, 894 (1934).

[20] *Id.*

[21] James, *Scope of Duty in Negligence Cases,* 47 NW U L Rev 778, 782 (1953). *See Terranella v Union Building & Construction Co,* 3 NJ 443; 70 A2d 753 (1950).

"A product designed to be used by adults who may be expected to exercise care may not be dangerous, but when intended to be placed in the hands of inexperienced children who may seek to enlarge their knowledge by experimentation of various and sometimes unexpected character, it may be a source of peril * * * ." *Crist v Art Metal Works,* 230 App Div 114, 117; 243 NYS 496, 499 (1930), *aff'd* 255 NY 624; 175 NE 341 (1931).

[22] Note, *Dangerous Toys,* 64 Irish L Times 223, 224 (1930); 38 Am Jur, Negligence, § 40, pp 685–686.

Special rules for children are not unusual. The attractive nuisance doctrine, an exception to the general rule limiting the liability of landowners for injuries to trespassers,[23] is based on the child's inability to appreciate danger and his inclination to explore without regard to the risk. The doctrine does not depend on the landowner's knowledge that the "individual" child is "incompetent".

The doctrine of negligent entrustment is not peculiar to automobiles but rather an ordinary application of general principles for determining whether a person's conduct was reasonable in light of the apparent risk.[24] It is grounded in the general

---

[23] *See generally,* Prosser, *supra,* § 59, p 364.

[24] While the Restatement's illustrations and the case law applying the doctrine of negligent entrustment largely concern suppliers of automobiles *(see, e.g., Johnson v Cassetta,* 197 Cal App 2d 272; 17 Cal Rptr 81 [1961]), it does not depend on the nature of the chattel. *Fredericks v General Motors Corp,* 48 Mich App 580, 585; 211 NW2d 44 (1973) (supply of dies to plaintiff's employer). *See also Dee v Parrish,* 160 Tex 171; 327 SW2d 449, 452 (1959); 65 CJS, Negligence, § 69, pp 949–950; *cf.* Woods, *Negligent Entrustment: Evaluation of a Frequently Overlooked Source of Additional Liability,* 20 Ark L Rev 101, 107–108 (1966); Littlejohn, *1974 Annual Survey of Michigan Law: Torts,* 21 Wayne L Rev 665, 681 (1975). Nor is the doctrine restricted to chattels classified as latently defective or inherently dangerous. *Fredericks, supra,* 584.

The Restatement sets forth a rule crystalized by the development of the common law concerning the liability of one who sells or entrusts devices to children who, because of their youth and inexperience, cannot be relied on to use them prudently, or because of their immaturity may not appreciate the risk of injury or have the skill to use such devices safely:

"At common law the legal principle is established that if one sells a dangerous article or instrumentality such as firearms or explosives to a child whom he knows or ought to know to be, by reason of youth and inexperience, unfit to be trusted with it, and who might innocently and ignorantly play with or use it to his injury, and injury does in fact result, he may be found guilty of negligence and consequently liable in damages." Anno, *Liability of Seller of Firearm, Explosive, or Highly Inflammable Substance to Child,* 20 ALR2d 119, 124.

*See also* 79 Am Jur 2d, Weapons and Firearms, § 43, p 48.

"The common law imposes upon every one the duty of so using and disposing of his property as not to injure the person or property of

principle that a reasonable person will have in mind the immaturity, inexperience and carelessness of children. If, taking those traits into account, a reasonable person would recognize that his conduct involves a risk of creating an invasion of the child's or some other person's interest, he is required to recognize that his conduct does involve such a risk. "He should realize that the inexperience and immaturity of young children may lead them to act innocently in a way which an adult would recognize as culpably careless, and that older children are peculiarly prone to conduct which they themselves recognize as careless or even reckless." 2 Restatement, *supra,* § 290, comment k.[25]

---

another, and if one sells a dangerous article to a child whom he knows to be, by reason of his youth and inexperience, unfit to be trusted with it, and who probably might innocently and ignorantly play with it to his own injury, and injury does in fact result, he is liable in damages therefor." *McEldon v Drew,* 138 Iowa 390, 392; 116 NW 147, 148 (1908).

In *McEldon,* the Court held that the seller of ten-cents worth of gun powder to a 12-year-old boy was liable for the injury to one of the boy's eyes caused by an inadvertent explosion. *See also Carter v Towne,* 98 Mass 567; 96 Am Dec 682 (1868).

Entrusting other devices used by children as playthings may also give rise to liability. *See Schmidt v Capital Candy Co,* 139 Minn 378; 166 NW 502 (1918) (sparkler) *(dictum); Bosserman v Smith,* 205 Mo App 657; 226 SW 608 (1920) (fireworks); *Gerbino v Greenhut-Siegel-Cooper Co,* 165 App Div 763; 152 NYS 502 (1915) (airgun used on retailer's premises); *Semeniuk v Chentis,* 1 Ill App 2d 508; 117 NE2d 883 (1954) (airgun; sale to parents, retailer knew that 7 year old would use); *Krueger v Knutson,* 261 Minn 144; 111 NW2d 526 (1961) (potassium chlorate); *LaFaso v LaFaso,* 126 Vt 90; 223 A2d 814 (1966) (cigarette lighter without fluid); Note, *supra,* 64 Irish L Times 223 (citing cases).

The only basis for distinguishing these cases from the instant case would be to conclude that there is a qualitative difference between the risk of entrusting such instrumentalities to children and the risk posed by marketing slingshots directly to children. In light of the frequency and severity of injuries to children attributable to slingshots, and the widely held view, expressed in statutes and ordinances, that children should not be entrusted with slingshots, there is no sound basis for creating, as a matter of law, such a distinction.

[25] An actor "is required to recognize that his conduct involves a risk

The issue whether the defendants are subject to liability cannot properly be taken from the jury on the supposition that an 11-year-old boy knows how a slingshot operates and, therefore, appreciates the risk.[26] Even if it is thought, without supporting evidence and as a matter of law, that children should be deemed to appreciate the risk, there still may be an unreasonable risk of physical harm to the child and others in marketing slingshots directly to them.

Entrusting potentially dangerous articles to a child may pose an unreasonable risk of harm not only because the child may not appreciate the risk or may not have the skill to use the article safely but—even if he does appreciate the risk and does have the requisite skill—because he may recklessly ignore the risk and use the article frivolously due to immaturity of judgment, exuberance of spirit, or sheer bravado.

"One has no right to demand of a child, or of any other person known to be wanting in ordinary judgment or discretion, a prudence beyond his years or capacity, and therefore in his own conduct, where it

---

of causing an invasion of another's interest if a reasonable man would do so while exercising (a) such attention, perception of the circumstances, memory, knowledge of other.pertinent matters, intelligence, and judgment as a reasonable man would have * * * " 2 Restatement, *supra*, § 289.

"For the purpose of determining whether the actor should recognize that his conduct involves a risk, he is required to know (a) the qualities and habits of human beings and animals and the qualities, characteristics, and capacities of things and forces in so far as they are matters of common knowledge at the time and in the community * * * ." *Id,* § 290.

[26] There is some evidence that one of the reasons slingshot injuries are experienced by children between the ages of 5 and 14 in disproportion to the populace generally is that the risk is not appreciated. *See,* Johnston, *Perforating Eye Injuries: A Five Year Survey,* 91 Transactions of the Ophthalmological Soc'y U K 895, 897 (1971); Kerby, *Eye Accidents to School Children,* 20 Sight-Saving Rev 2 (1950).

may possibly result in injury, a degree of care is required commensurate to the apparent immaturity or imbecility that exposes the other to peril. Thus, a person driving rapidly along a highway where he sees boys engaged in sports, is not at liberty to assume that they will exercise the same discretion in keeping out of his way that would be exercised by others; and ordinary care demands of him that he shall take notice of their immaturity and govern his action accordingly." 3 Cooley, Law of Torts (4th ed), § 490, pp 433-434.

Just as the driver of an automobile is expected to take precautions for the safety of children playing near a highway even though children can be expected to appreciate the risk and the driver does not know that the individual children are incompetent to look after themselves,[27] so too a supplier

---

[27] Reasonable precautions must be taken even though the actor does not know that an individual child is not competent and the child may appreciate the risk:

"And when children are in the vicinity, much is necessarily to be expected of them which would not be looked for on the part of an adult. It may be anticipated that a child will dash into the street in the path of a car, or meddle with a turntable. It may be clear negligence to entrust him with a gun, or to allow him to drive an automobile, or to throw candy where a crowd of boys will scramble for it. There have been a number of 'pied piper' cases, in which street vendors of ice cream, and the like, which attract children into the street, have been held liable for failure to protect them against traffic. It may be quite as negligent to leave the gun, or to leave dynamite caps, where children are likely to come, and can easily find them. In all such cases, the question comes down essentially to one of whether the risk outweighs the utility of the actor's conduct. He may be required to guard a power line pole located in a public park, but not one in the open country; and whether he must take steps to prevent children from interfering with such an object as a stationary vehicle is entirely a matter of the circumstances of the particular case." Prosser, *supra*, § 33, pp 172-173.

"In addition, people who have an ordinary amount of exposure to the facts of modern life in America will be treated as though they know many other things. The normal adult is held to have knowledge of the characteristics of animals common to his community, such as the proneness of mules to kick, the viciousness of bulls, and the propensity of mad dogs to bite. He is also required to be acquainted

can be expected in marketing a product to take precautions for the safety of children and others even if the child may be expected to appreciate the risk and individual children may both appreciate it and be skilled in using the product. It is for a jury to decide whether any negligence in marketing slingshots directly to children is a cause in fact of plaintiff's loss.[28]

## III

### REASONABLENESS OF THE RISK OF HARM

Even if a person recognizes that his conduct

---

with *the natural propensities of children*,[35] the dangers incident to common sports, and the elements of the weather to which he is accustomed.

---

"[35] Such as their heedlessness—*Femling v Star Publication Co,* 195 Wash 395; 81 P2d 293 (1938); the attractiveness of ponds of water—*Davoren v Kansas City,* 308 Mo 513; 273 SW 401; 40 ALR 473 (1925); the attractiveness of dangerous objects such as explosives—*Wellman v Fordson Coal Co,* 105 W Va 463; 143 SE 160 (1928); childish impulses —*Louisville & NR Co v Vaughn,* 292 Ky 120; 166 SW2d 43 (1943); climbing propensity—*Deaton's Administrator v Kentucky & West Virginia Power Co,* 291 Ky 304; 164 SW2d 468 (1942); propensity of small children to wander into streets—*Agdeppa v Glougie,* 71 Cal App 2d 463; 162 P2d 944 (1945). Compare § 27.5 infra."

---

2 Harper & James, *supra,* § 16.5, pp 912–913.

The trier of fact decides whether reasonable precautions have been taken and thereby establishes the specific standard of care:

"The common formula for the negligence standard is the conduct of a reasonable man under like circumstances. In applying this standard under the instructions of the court, the jury normally is expected to determine what the general standard of conduct would require in the particular case, and so to set a particular standard of its own within the general one. This function is commonly said to be one of the determination of a question of fact, and not of law. It differs from the function of the court, however, only in that it is not reduced to any definite rules, so that the same conclusion will not necessarily be reached in two identical cases, and that it is a secondary function, performed only after the court has reached its initial conclusion that the issue is for the jury." 2 Restatement, *supra,* § 328 C, comment on clause (b).

[28] A jury might conclude that because the child was skilled in the use of a slingshot and did not use it frivolously, the manner of marketing the slingshot was not the cause in fact of plaintiff's injury.

involves a risk of invading another person's inter-
est, he may nevertheless engage in such conduct
unless the risk created by his conduct is unreason-
able.

The reasonableness of the risk depends on
whether its magnitude is outweighed by its utility.
The Restatement provides: "Where an act is one
which a reasonable man would recognize as involv-
ing a risk of harm to another, the risk is unreason-
able and the act is negligent if the risk is of such
magnitude as to outweigh what the law regards as
the utility of the act or of the particular manner
in which it is done." 2 Restatement, *supra,* § 291.

The balancing of the magnitude of the risk and
the utility of the actor's conduct requires a consid-
eration by the *court and jury* of the societal inter-
ests involved.[29] The issue of negligence may be
removed from jury consideration if the court con-
cludes that overriding considerations of public
policy require that a particular view be adopted
and applied in all cases.

A court would thus refuse to allow a jury to
consider whether an automobile manufacturer
should be liable for all injuries resulting from
manufacturing automobiles on the theory that it is
foreseeable that some 50,000 persons may be killed
and hundreds of thousands injured every year as a
result of manufacturing automobiles. The utility of
providing automobile transportation is deemed by
society to override the magnitude of the risk cre-
ated by their manufacture. Similarly, a court
might conclude that it would be violative of public
policy to hold a manufacturer of slingshots liable

---

[29] "Conduct is not negligent unless the magnitude of the. risk
involved therein so outweighs its utility as to make the risk unreason-
able. Therefore, one relying upon negligence as a cause of action or
defense must convince the *court and jury* that this is the case." 2
Restatement, *supra,* § 291, comment b (emphasis supplied).

for all injuries resulting from their use. The interest of mature persons who wish to purchase and use slingshots might be deemed to supersede the interest of those who may be harmed by their careless or improper use.

The issue in the instant case is not whether slingshots should be manufactured, but the narrower question of whether marketing slingshots directly to children creates an unreasonable risk of harm. In determining that question, the Court must first ask whether the utility of marketing slingshots directly to children so overrides the risk thereby created as to justify the Court in refusing to permit juries to subject persons who engage in such conduct to liability for the resulting harm. If it concludes that the utility does not, as a matter of law, override the risk, then the question of balancing utility and risk is for the jury to decide, again, as part of its consideration of the reasonableness of defendants' conduct, unless the Court concludes that all reasonable persons would be of one mind on that question.

The Restatement suggests a number of factors that should be considered in balancing the utility of the actor's conduct and the magnitude of the risk. First, the magnitude of the risk:

"In determining the magnitude of the risk for the purpose of determining whether the actor is negligent, the following factors are important:

"(a) the social value which the law attaches to the interests which are imperiled;

"(b) the extent of the chance that the actor's conduct will cause an invasion of any interest of the other or of one of a class of which the other is a member;

"(c) the extent of the harm likely to be caused to the interests imperiled;

"(d) the number of persons whose interests are likely

to be invaded if the risk takes effect in harm." 2 Restatement, *supra,* § 293.

a) The law attaches a high social value to the interest of persons in unimpaired eyesight.

b) Slingshots are potentially dangerous. An expert witness, called by Moning, testified that the slingshots Alfono purchased were capable of launching projectiles at speeds exceeding 350 miles per hour. Slingshots cause hundreds of serious injuries each year to school-age children. Almost all these injuries are head or eye injuries and occur to children 5 to 14.[30] Experience therefore shows that marketing slingshots to children may with substantial frequency cause an invasion of the interest in unimpaired eyesight of a substantial number of persons.

c) The extent of the harm likely to be caused to the interest so imperiled may be of a most serious nature.

---

[30] Projections from one study indicate that nearly 66,000 school children in the United States during any 9-month school year suffer injuries to the eye. Over 4% of the reported injuries in a study carried out in Louisville were caused by slingshots and other weapons. Such instrumentalities were responsible for 17% of the more serious injuries. Kerby, *supra,* 20 Sight-Saving Rev, 3–4, 11.

Another study shows that "[t]here were an estimated 471 injuries related to slingshots and sling propelled toys during the period July 1, 1974–July 30, 1975, treated in United States hospital emergency rooms, all but 2 of which were head or eye injuries to victims under 15 years of age". United States Consumer Product Safety Commission, Bureau of Epidemiology, *Special Report: Injuries Associated with Products Which Have Projectiles* (Draft, October 23, 1975), p 15. During the same time period, 2,120 injuries reported to hospital emergency rooms involved projectile products. *Id,* p 17.

The United States Consumer Product Safety Commission states that since "[s]lingshots range from toys to hunting models capable of killing small game * * * it is recommended that high powered slingshots be sold only to persons over 20 years of age". *Id,* p 23. The commission concluded that "[o]verall, projectile products include a diverse array of products which while they share a common hazard are very different in age of users, intended use, and likelihood and consequences of misuse," and that therefore "Commission action would be most effective" "in the area of toy guns and other toy weapons with projectiles and slingshots." *Id.*

d) The number of persons whose interests are likely to be invaded is difficult to estimate, but it appears that hundreds of injuries, many resulting in serious impairment of vision, occur every year as a result of the use of slingshots by children.[31]

Turning to utility:

"In determining what the law regards as the utility of the actor's conduct for the purpose of determining whether the actor is negligent, the following factors are important:

"(a) the social value which the law attaches to the interest which is to be advanced or protected by the conduct;

"(b) the extent of the chance that this interest will be advanced or protected by the particular course of conduct;

"(c) the extent of the chance that such interest can be adequately advanced or protected by another and less dangerous course of conduct." 2 Restatement Torts, 2d, § 292.

a) There is a sharp difference of opinion concerning the social value of the child's interest in having direct-market access to slingshots. The view that slingshots should not be sold or used by children is widely held and is reflected in statutes and ordinances prohibiting the sale of slingshots to or their use by minors.

Statutes and other legislative judgments may themselves be a source of common law. "This legislative establishment of policy carries significance beyond the particular scope of each of the statutes involved. The policy thus established has become itself a part of our law, to be given its appropriate weight not only in matters of statutory construction *but also in those of decisional*

---

[31] *See* fn 30, *supra,* and accompanying text.

law." *Moragne v States Marine Lines, Inc,* 398 US
375, 390–391; 90 S Ct 1772; 26 L Ed 2d 339 (1970).[32]
Similarly, see *Williams v Polgar,* 391 Mich 6, 14,
26–28; 215 NW2d 149 (1974).[33]

North Carolina and Mississippi prohibit sale of a
slingshot to a minor.[34] Idaho prohibits sale to a
minor under 16 without parental consent.[35] Missis-
sippi holds a father liable for allowing a son under
16 to have, own or carry concealed a slingshot.[36]
Pennsylvania prohibits sale to and carrying by
persons under 18 of an implement "which impels a
pellet of any kind with a force that can reasonably
be expected to cause bodily harm".[37] Nine states
prohibit any person from carrying a concealed
slingshot.[38] A number of states consider slingshots

[32] The United States Supreme Court, relying on state statutes
providing for wrongful death actions and overruling cases to the
contrary, held that under general maritime law there was a cause of
action for wrongful death.

State courts created an action for wrongful death in admiralty
cases, based on statutes not, by their terms, applicable to maritime
cases. In that context, judges were "awake to the purport of this
legislative movement, eagerly seized upon principles derivable from
'natural equity' and 'consonant * * * with the benign spirit of Eng-
lish and American legislation on the subject' to mould admiralty law
to conform with the trend of civilized thought". Landis, *Statutes and
the Sources of Law,* Harvard Legal Essays, pp 213, 226 (1934). Several
state courts have relied on statutes in other jurisdictions as "the
wiser and safer rule," notwithstanding local common law to the
contrary, in holding that a general devise operates to execute a power
of appointment vested in the testator. *Id,* p 231.

Legislative judgments or trends and statutory changes may be
relevant in assessing the "national conscience" in common-law and
constitutional adjudication. *See Furman v Georgia,* 408 US 238, 298–
299; 92 S Ct 2726; 33 L Ed 2d 346 (1972) (Brennan, J., concurring).

[33] In extending the obligation of an abstractor to persons not in
privity of contract, this Court relied in part on statutes of other
jurisdictions so providing.

[34] NC Gen Stat § 14-315; Miss Code Ann § 97-37-13.

[35] Idaho Code § 18-3302.

[36] Miss Code Ann § 97-37-15.

[37] Pa Stat Ann, title 18, § 6304 (Purdon).

[38] Alas Stat Ann § 11.55.010; Idaho Code § 18-3302; Miss Code Ann
§ 97-37-1; Mont Rev Codes Ann § 94-3525; Tenn Code Ann § 39-4901;

to be deadly weapons and treat them under statutes prohibiting carrying concealed weapons.[39] Many cities regulate the sale and possession of slingshots.[40]

Michigan empowers fourth class cities to "prohibit and punish the use of toy pistols, *sling shots and other dangerous toys* or implements within the city" (emphasis supplied).[41] Nine cities in this state prohibit persons from possessing slingshots,[42] five others prohibit possession by or sale to minors.[43] Those ordinances generally classify slingshots as "dangerous weapons".[44]

---

Utah Code Ann § 76-23-4; NC Gen Stat § 14-269; SC Code § 16-23-460; RI Gen Laws § 11-47-42.

[39] Alas Stat Ann § 11.55.010 (treated, along with pistols, firearms and daggers, under carrying concealed weapons statute); Del Code Ann, title 11, § 222(5) (defined to be a "deadly weapon"); DC Code Ann § 22-3217 ("dangerous article"); Idaho Code § 18-3302 (treated with "concealed and dangerous weapons"); Ind Code Ann § 35-1-79-1 (Burns) ("dangerous weapon"); Mass Laws Ann, ch 269, § 12 (sale prohibited, along with switch knife, sword cane, bludgeon and blackjack); Miss Code Ann § 97-37-1 ("deadly weapon"); Mont Rev Codes Ann § 94-3525 ("deadly weapon"); NJ Stat Ann §§ 2A:151-2, 2A:151-5 (West) ("weapon," "dangerous instrument"); NC Gen Stat § 14-269 ("deadly weapon"); SC Code § 16-23-460 ("deadly weapon"); Tenn Code Ann § 39-4901 ("dangerous weapon"); Utah Code Ann § 76-23-4 ("deadly weapon"). *See* Ga Code Ann § 26-2901, committee notes, p 201.

[40] 39 Fed Reg 16707–16710 (1974).

[41] MCLA 91.1; MSA 5.1740.

Home-rule cities possess the police power and thus there is no need for specific enabling legislation. MCLA 117.3; MSA 5.2073.

[42] Belding ordinances, § 12.11; Buchanan ordinances, § 11.4; Center Line ordinances, § 8-108; Escanaba ordinances, § (D); Grand Haven ordinances, § 8-209; Hazel Park ordinances, § 15; Sterling Heights ordinances, § 7.(1); Trenton ordinances, § 9.171, and Warren ordinances, § 8-210. *See* 39 Fed Reg 16708–16710 (1974).

[43] Gladstone ordinances, § 504.06 (prohibits possession, sale, or gift to persons younger than 18); Lake Orion ordinances, § 9 (prohibits sale, offer to sale, give away or distribute to persons under the age of 21); Port Huron ordinances, § 9.117 (prohibits parents to knowingly permit child under 18 to use or possess except under adult supervision); Waterford ordinances, § 61-IX (prohibits possession, sale or gift to persons younger than 21); Royal Oak ordinances, § 276.1(c) (prohibits selling or giving to persons under 16). *See* 39 Fed Reg 16707–16710 (1974).

[44] *See* 39 Fed Reg, *supra.*

It is apparent from the legislation in other state and innumerable municipalities that all reasonable persons do not agree that marketing slingshots directly to children does not involve an unreasonable risk of harm. The failure of other states and cities to enact like statutes and ordinances, and of the Legislature either to authorize or prohibit the marketing of slingshots directly to children, indicates a variety of opinion, but not a consensus regarding the reasonableness of marketing slingshots directly to children.

b) Children are more likely to obtain slingshots if they are marketed directly to them.

c) Slingshots could be marketed in a manner designed to confine sale to adults and to exclude purchases by children. Instead of manufacturers, wholesalers and retailers effectively determining whether children shall have slingshots, an adult who generally would know the child would decide whether he is of sufficient maturity to have one; the adult would, under the common law, assume responsibility for any negligence on his part in entrusting a slingshot to the child.

Having in mind the parent's interest in protecting the child from potentially dangerous instrumentalities[45] and in avoiding exposure to litigation such as befell the Alfonos, the child's interest in an opportunity to use slingshots cannot be said as a matter of law to be inadequately advanced or protected by allowing a jury to decide that a manufacturer, wholesaler or retailer is negligent in marketing them directly to children.

Balancing the magnitude of the risk and the utility of the conduct in the application of the factors suggested by the Restatement, there is not

---

[45] *See generally* 59 Am Jur 2d, Parent and Child, § 106, p 205 *et seq.;* Prosser, *supra,* § 125, p 888 *et seq.*

a sufficient basis for concluding as a matter of law that the utility of the defendants' conduct outweighs the risk of harm thereby created. The sharp difference of opinion regarding the balancing of utility and risk of harm requires submission of these questions for jury assessment as part of its consideration of the reasonableness of the risk of harm and of defendants' conduct.

While "slingshots have a long history of association with the human race" and have been used for hundreds of years by both adults and children, the common law is not immutable, unable to respond to changes in society and technology.

"The customary usage and practice of the industry is relevant evidence to be used in determining whether or not this standard [of reasonably prudent conduct] has been met. Such usage cannot, however, be determinative of the standard. As stated by Justice Holmes:
" 'What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not.' *Texas & P R Co v Behymer,* 189 US 468, 470; 23 S Ct 622; 47 L Ed 905 (1903)." *Marietta v Cliffs Ridge, Inc,* 385 Mich 364, 369–370; 189 NW2d 208 (1971).

As society becomes increasingly urbanized and access to open space decreases, the law responds and develops.

Modern technology may have magnified the risk of ricochet and of injury to persons not in the immediate range or direction in which the slingshot is aimed. Slingshots capable of firing projectiles at 350 miles per hour may be a far cry from those historically made by children from rubber bands and household paraphernalia.

Nor does calling a slingshot a "toy" make it any less dangerous nor immunize its marketing di-

rectly to children from the general rules of negligence liability.[46]

There is a qualitative difference between slingshots and other projectile "toys" on the one hand, and baseball equipment and bicycles on the other. The latter are viewed by society essentially as are automobiles in that although children are injured and killed riding bicycles and playing baseball, the utility of such activity is regarded by society and all reasonable persons as outweighing the risk of harm created by their manufacture for and marketing to children. Statutes and ordinances do not prohibit the purchase or use of bicycles or baseball equipment by children. There is no ongoing debate, as there is about slingshots, whether children should have direct market access to bicycles or baseball equipment.

In sum, it cannot be said that there was no "obligation of reasonable conduct for the benefit of the plaintiff",[47] or that all reasonable men would agree that defendants' conduct was not "a substantial factor in producing the result"[48] or regarding "the foreseeability of [the] particular risk"[49] or regarding "the reasonableness of the defendants' conduct with respect to it, or the normal character of [Alfono's conduct]"[50] as an intervening cause.

---

[46] A slingshot is no more a toy than a sparkler, fireworks, an air gun or an empty cigarette lighter, yet courts have sustained liability for the entrustment of such articles to children. See fn 24, supra. Books prepared for parents speak of the dangers of such "toys". See, e.g., Swartz, Toys That Don't Care (Gambit, Inc, 1971), p 251. The toy industry has acknowledged its awareness of the risks; the industry's proposed draft of Voluntary Product Standards for Toy Safety (May, 1972), while excluding slingshots from coverage, states that there are "[c]ertain well-recognized hazards inherent in such traditional toys as bows and arrows, slingshots and darts," quoted in Swartz, Blindness in the Toy Box, 43 Sight-Saving Rev 95, 97 (1973).

[47] Prosser, supra, § 45, pp 289–290.

[48] Id.

[49] Id.

[50] Id.

Since reasonable persons can differ regarding the balance of risk and utility (the reasonableness of the risk of harm) and since there is no overriding policy based on social utility of maintaining absolute access to slingshots by children, we reverse and remand for a new trial.

KAVANAGH, C. J., and WILLIAMS, J., concurred with LEVIN, J.

RYAN and BLAIR MOODY, JR., JJ., took no part in the decision of this case.

FITZGERALD, J. *(dissenting)*. This appeal concerns the propriety of a trial court's grant of directed verdict in favor of defendants, the manufacturer, wholesaler, and retailers of a slingshot, in an action brought by plaintiff to recover for injuries sustained as a result of use of the slingshot.

Evidence introduced at trial indicated that on August 17, 1967, Joseph Alfono, age 11, purchased two 10¢ slingshots from defendant Campbell Discount Jewelry. He gave one of the slingshots to plaintiff, age 12, and the boys rode their bicycles to a nearby park. At the park plaintiff and Joseph Alfono employed their slingshots to shoot projectiles at frogs which they found in the vicinity of a pond. The incident of injury occurred when plaintiff was standing near the small pond and Joseph was on the side of a nearby hill. Joseph called to plaintiff to look up and watch as Joseph shot at a bird. When plaintiff looked up, he was struck in the left eye by a projectile from Joseph's slingshot. Evidence introduced at trial indicated that the injuring slingshot was manufactured by Chemical Sundries, Inc.,[1] and distributed by King Tobacco and Grocery Co.

---

[1] After commencement of this litigation the name of defendant was changed to Chemtoy Corporation.

Settlement was agreed upon between plaintiff and defendant Alfonos with the result that the Alfonos were only nominal parties to the litigation.[2] The trial court, upon motion of the remaining defendants after presentation of plaintiff's proofs, granted directed verdict in favor of defendants, opining that defendants owed plaintiff no legal duty upon which recovery could be premised and that defendants' conduct was not the proximate cause of plaintiff's injury.[3] The Court of Appeals affirmed in an unpublished per curiam opinion. We granted leave to appeal.

We would affirm the trial court and the Court of Appeals, concluding defendants did not owe plaintiff minor the asserted duty not to manufacture, distribute and sell slingshots.

I

Prosser, in his treatise on the law of torts, offers the following analysis of the role of the court and jury respecting the question of whether a legal duty is owed by one party to another:

"3. The existence of a duty. In other words, whether, upon the facts in evidence, such a relation exists between the parties that the community will impose a legal obligation upon one for the benefit of the other— or, more simply, whether the interest of the plaintiff which has suffered invasion was entitled to legal protection at the hands of the defendant. This is entirely a question of law, to be determined by reference to the body of statutes, rules, principles and precedents which

[2] The Alfonos are party to a cross-appeal concerning their respective rights against the other defendants in the event this Court were to set aside the directed verdict entered by the trial court.

[3] The trial court's extensive opinion was issued from the bench and evidences thorough consideration of the case before that court.

make up the law; and it must be determined only by the court. *It is no part of the province of a jury to decide whether a manufacturer of goods is under any obligation for the safety of the ultimate consumer,* * * * . A decision by the court that, upon any version of the facts, there is no duty, must necessarily result in judgment for the defendant." (Emphasis supplied.) Prosser, Torts (4th ed), § 37, p 206.

Decisions of this Court have in similar fashion recognized that the question of duty is to be resolved by the court rather than the jury. See *Fisher v Johnson Milk Co, Inc,* 383 Mich 158, 162; 174 NW2d 752 (1970), in which the Court viewed summary judgment for defendant manufacturer of a wire milk bottle carrier proper after determination that there was "no legal duty to supply a carrier so designed as to prevent bottles placed therein from breaking when dropped to a hard surface". Also, see *Bonin v Gralewicz,* 378 Mich 521, 527; 146 NW2d 647 (1966).

The trial court in this case found no legal duty owed plaintiff by defendants. We now review—as a question of law—that determination.

## II

During the course of proceedings below plaintiff has alleged that the defendants violated numerous duties[4] which attached liability. Through the sifting and winnowing action of the trial and appel-

---

[4] Among these duties was the duty to warn plaintiff purchaser of the dangerous propensities of a slingshot either by personal notification as in the case of a retailer or by printed notice as in the case of the wholesaler and manufacturer. Other courts have uniformly rejected a duty to warn when confronted with products, like the slingshot, the dangerous propensities of which are well known. *See, e.g., Pitts v Basile,* 35 Ill 2d 49; 219 NE2d 472 (1966), and *Morris v Toy Box,* 204 Cal App 2d 468; 22 Cal Rptr 572 (1962). *See, also,* Prosser, Torts (4th ed), § 96, p 649.

late process these allegations have been refined so that we have presently before us only the following contention as stated at page 11 of plaintiff's brief:

"Plaintiff's position [is] that the defendants had a duty as reasonably prudent manufacturers, distributors and retail merchants not to manufacture, market and sell these slingshots to young children."

It is asserted that two factors give rise to this duty:

"(1) the inherently dangerous nature of the slingshot, and (2) the youthfulness and lack of discretion of the purchasers."

The question before us is not settled by Michigan case law precedent. A related question was considered by this Court, however, in *Chaddock v Plummer,* 88 Mich 225; 50 NW 135 (1891). In *Chaddock,* an air gun case, this Court affirmed a directed verdict in favor of the father-purchaser of an air gun used by a neighbor boy in injurious fashion. Evidence indicated the mother, rather than the father, was in "control" of the premises at the time the gun was loaned to and used by the visiting child. Negligence of the mother was not asserted. The Court concluded:

"[I]t was not negligence *per se* for the defendant to buy this toy gun, and place it in the hands of the boy nine years of age; and there were too many intervening causes without the act or knowledge of the defendant, between the buying of the gun and the injury to hold the defendant liable for its use in this case. If his own son had, in any manner, contributed to the accident, a different question would arise, upon which I express no opinion." *Supra* 230.

*Whalen v Bennett,* 4 Mich App 81; 143 NW2d
797 (1966), involved the circumstance of injury
which occurred when defendant's son shot an air
gun while playing with friends and injured one of
his companions. The Court of Appeals[5] concluded
that the trial court's grant of summary judgment
was improper, there being evidence indicating that
a duty on the part of the parent, to supervise the
use of an instrumentality as dangerous as an air
gun, had been breached.[6] Neither *Chaddock* nor
*Whalen* dealt with the liability of retailers, whole-
salers, or manufacturers.[7]

Cases from other jurisdictions offer instruction
not afforded by Michigan precedent. In *Pitts v
Basile,* 35 Ill 2d 49; 219 NE2d 472 (1966), a child
struck by a dart thrown by another child brought
suit against the wholesaler of the dart and the
retailer from whom the darts had been purchased.
The appeal considered only the question of the
wholesaler's liability. The Illinois Supreme Court
concluded that there was insufficient causal con-

---

[5] Justice FITZGERALD authored the opinion when sitting as a judge
of the Court of Appeals.

[6] *See* for an analogous holding, which additionally discusses applica-
tion of Restatement Torts, 2d, § 390, discussed *infra* herein, *Freder-
icks v General Motors Corp,* 48 Mich App 580; 211 NW2d 44 (1973).

[7] Plaintiff also asserts that *Crowther v Ross Chemical & Manufac-
turing Co,* 42 Mich App 426; 202 NW2d 577 (1972), is a case in point.
This action was brought to recover for the wrongful death of two
young girls who were killed by a man who had allegedly been sniffing
glue manufactured by defendant. The Court of Appeals concluded
that the trial court's grant of summary judgment was inappropriate
because

"It is an issue of fact whether, as plaintiff alleges in his complaint,
the practice of glue sniffing was, at this time, sufficiently notorious
that defendant knew or should have known this was an alternative
use for its product."

In *Crowther,* however, summary judgment on the pleadings alone
was involved. Here we have a directed verdict granted after plaintiff
has presented all his proofs. The thrust of decision in *Crowther* was
that plaintiff be given an opportunity to present proofs. In the present
case plaintiff enjoyed such opportunity. *Crowther* is therefore not of
decisional significance to the case before us.

nection between alleged negligence on the part of the wholesaler and resulting injury, finding that there was no relation between the marketing of the darts and subsequent injury. In addition, the Court commented:

"We are not concerned in this case with the liability of the proprietors of the grocery store who sold the darts to the eight-year-old boy, but with the liability of the defendant [wholesaler], who sold the darts to the proprietors of the grocery store. There was no contention or proof that the darts were in any way defective, and the appellate court emphasized that it was not characterizing them as 'inherently dangerous.' In this court, however, the plaintiff urges that the defendant's ' "non-defective" dart manifestly was not safe when used by small children for the purpose for which it was intended. The dart in question was intended to be thrown at various objects * * * . Its propensity to cause serious injury, particularly to the eyes, was demonstrated by the very injury suffered by the infant plaintiff in the instant case.'

"There are many things used by children that may be said to be unsafe when used for the purpose for which they are intended. A baseball, a baseball bat, a penknife, a Boy Scout hatchet, a bicycle, all have the capacity to injure the user or others in the course of their normal use. They are not, however, to be categorized as 'dangerous instrumentalities.' As was said by the Tennessee court in *Highsaw v Creech*, 17 Tenn App 573, 69 SW2d 249, 252 [1934], 'an air gun is not a dangerous instrumentality of itself, but is in fact a toy. * * * The fact alone that an injury may be inflicted by such a toy does not make of it a dangerous instrumentality in the sense that the term is generally used.' In *Morris v Toy Box*, 204 Cal App 2d 468, 22 Cal Rptr 572, 574–575 (1962), a complaint brought by a minor against a retailer alleging that the retailer knew that the intended user of a bow and arrow was the purchaser's ten-year-old boy was dismissed, the court saying, 'the bow and arrow has been in use by young and old alike for

thousands of years. * * * To us it is simply inconceivable that a 10-year-old boy, much less his mother, would be unacquainted with the use of so common an article as the one here in question.' See also, *White v Page,* 105 NE2d 652 (Ohio App, 1950)." *Supra,* 35 Ill 2d 49, 51–52; 219 NE2d 472, 473, 474.

The Supreme Court of Oklahoma in *Atkins v Arlan's Department Store of Norman,* 522 P2d 1020 (Okla, 1974), quoted the above from *Pitts v Basile* in concluding that there was no cause of action for plaintiff against the manufacturer and retailer of a lawn dart game for injury caused when a lawn dart struck the eye of a child. That Court concluded:

"There are many toys and playthings, perfectly harmless and inoffensive in themselves, but whose common use can be perverted into a dangerous use and design, and there are very few of the most harmless toys which cannot be used to injure another. The dart's propensities to cause injury is demonstrated by the injury sustained but the fact that an injury was sustained does not necessarily mean that the manufacturer or retailer are liable for those injuries.

\* \* \*

"The dart in question was not designed or manufactured to be thrown at an individual but at a plastic ring or another target." 1022.

In *Morris v Toy Box,* 204 Cal App 2d 468; 22 Cal Rptr 572 (1962), the Second District Court of Appeals of California faced the allegation of plaintiff that the retailer of a bow and arrow was liable for injuries sustained by a child who had been struck by an arrow shot by the son of the buyer of the bow and arrow. The California Court rejected the

notion that a bow and arrow were "inherently dangerous",[8] and commented:

> "*As in the case of a sling shot*,[9] the bow and arrow has been in use by young and old alike for thousands of years; its method of operation, therefore, is a matter so notorious to all that production of evidence relative thereto would be unnecessary * * * ." (Emphasis supplied) 472.

The Court concluded there was no duty on the part of the retailer to warn of the dangers incident to the bow and arrows' use and found no cause of action.[10]

Plaintiff refers us to § 390 of the Restatement of Torts, 2d, indicating that this section affords a basis for liability. This section states:

> "One who supplies directly or through a third person a chattel for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them."

A similar contention was rejected by the California Court of Appeals in *Bojorquez v House of Toys,*

---

[8] The talismanic label "inherently dangerous" attained significance because a finding of "inherent dangerousness" avoided the privity requirement of contract law subjecting the wholesaler, manufacturer or retailer to liability in tort. Plaintiff's complaint is framed in terms of negligence. The doctrine of "inherent dangerousness" is not of decisional significance to the case at hand.

[9] The California Court at this point footnotes the following:

"And David prevailed over the Philistine, with a sling and a stone, and he struck, and slew the Philistine. (1 *Kings* [1 *Sam]* 17:50.)"

[10] The New Jersey Superior Court similarly commented that a plastic slingshot was not a dangerous instrumentality in *Levis v Zapolitz*, 72 NJ Super 168; 178 A2d 44 (1962), a case involving injury sustained as a result of a defective slingshot.

*Inc,* 62 Cal App 3d 930, 933; 133 Cal Rptr 483, 484 (1976), with the following remarks.

"A ten cent slingshot is a toy although its use, like the use of other toys, such as baseball bats and bows and arrows, may cause injury to others. The cases we have found under section 390 and the illustrations provided in the Restatement all involve the sale or entrustment of a chattel to a particular individual who allegedly was known to the seller to be too young, inexperienced or incompetent to use the item properly.

"Here [plaintiff] wants us to hold the retailer and distributor negligent for selling toy slingshots to the class of persons for whom they were intended—the young; in effect, she asks us to ban the sale of toy slingshots by judicial fiat. Such a limitation is within the purview of the Legislature, not the judiciary."

The illustrations to the Restatement indicate that that section was intended to apply when knowledge of an individual's circumstances indicates to the supplier reasonable likelihood that the individual supplied is incompetent to use the chattel supplied and may therefore cause harm to himself and others. Plaintiff in this case seeks an extension of the Restatement doctrine to recognize the status of children, rather than circumstances concerning an individual child, and in relation thereto to circumscribe with duty the distribution of toys, the misuse of which involves a likelihood of injury —*i.e.,* here, slingshots.

## III

In our view we are being asked to perform a legislative task. If we were to find a duty on the part of defendants not to supply slingshots to children, we would in effect be making a value judgment and saying to defendants and their coun-

terparts that such—in this instance—toys should not be manufactured or marketed.

As has been noted, slingshots have a long history of association with the human race. Indeed, anyone can make one from a tree branch and a piece of inner tube. We acknowledge that there are dangers incident to their use and that such dangers are magnified when slingshots are used by minors. In the case of use by a minor, the law recognizes that parents have some responsibility of supervision. See, *e.g., Whalen v Bennett, supra. Cf. Chaddock v Plummer, supra.*

In the absence of legislative prescription circumscribing the manufacture, distribution, or sale of slingshots or providing that defendants insure against the misuse of their products, we are unable to find a duty upon which the liability of defendants may be premised.

We would affirm.

COLEMAN, J., concurred with FITZGERALD, J.