## KINTIGH v ABBOTT PHARMACY

Docket No. 143369. Submitted March 31, 1993, at Grand Rapids. Decided June 7, 1993, at 10:15 A.M. Leave to appeal sought.

David C. Kintigh brought an action in the Kent Circuit Court against Abbott Pharmacy, Benny Abbott, and other pharmacies and pharmacists, alleging negligence in the defendants' failure to discover his addiction to codeine and their repeated sale of nonprescription cough syrup containing codeine, a Schedule V controlled substance. The court, Dennis B. Leiber, J., granted summary disposition for the defendants, ruling that the plaintiff had failed to state a claim on which relief could be granted. The plaintiff appealed.

The Court of Appeals *held:*

The plaintiff's claim is so clearly unenforceable as a matter of law that no factual development could possibly justify a right of recovery. A pharmacist does not owe a customer a legal duty to monitor drug usage.

Affirmed.

D.E. SHELTON, J., dissenting, stated that a pharmacist who dispenses controlled, addictive, nonprescription drugs in violation of applicable statutes, regulations, and professional standards owes an actionable legal duty to a customer who develops or furthers an addiction to those drugs.

DRUGGISTS — NEGLIGENCE — CONTROLLED SUBSTANCES.

A pharmacist owes no legal duty to monitor a customer's usage of nonprescription medication containing a controlled substance listed in Schedule V of the Federal Food, Drug, and Cosmetic Act (21 USC 812).

*William G. Reamon, Sr.,* for David C. Kintigh.

*Tolley, Fisher & Verwys, P.C.* (by *Mark H. Verwys* and *James B. Doezema*), for Abbott Pharmacy and Benny Abbott.

REFERENCES

Am Jur 2d, Drugs, Narcotics, and Poisons §§ 55, 63.
See ALR Index under Drugstores and Druggists.

*Kluczynski, Girtz & Vogelzang* (by *Ella S. Parker*), for Bud Discount Pharmacy, Russell M. Ripma, Lewis Langridge, Richard T. Gibson, and Edwin C. Gort.

*Denenberg, Tuffley, Bocan, Jamieson, Black, Hopkins & Ewald, P.C.* (by *Curt A. Benson* and *Michelle F. Kitch*), for Cascade Pharmacy, Charles J. Leen, Heartside Pharmacy, James G. Coombs, and Peter L. Middleton.

*Davis & Fajen* (by *Peter A. Davis* and *Nelson P. Miller*), for Eastgate Pharmacy and Ward Duyser.

*Farr & Oosterhouse* (by *John R. Oostema*), for Finer Wyoming Pharmacy and Robert B. Feighner.

*Bremer, Wade, Nelson, Mabbitt & Lohr* (by *Phillip J. Nelson*), for The Medicine Shoppe and Kurt Johnson.

*Cholette, Perkins & Buchanan* (by *Robert E. Attmore*), for Gene Meyer Pharmacy, Edward G. Cantor, and Edward G. Sindelar.

*Smith, Haughey, Rice & Roegge* (by *Lance R. Mather*), for Reagan's Pharmacy and B. Terrence Reagan.

*Miller, Canfield, Paddock & Stone* (by *Gary E. Mitchell*), for Rite-Aid Discount Pharmacy, Timothy Bos, Robert G. Mitchell, Joseph Bristol, David R. Smith, and Sweet's Pharmacy.

*Linsey, Strain & Worsfold, P.C.* (by *Peter D. Bosch*), for Tom's Pharmacy, Thomas J. Taylor, Richard Kleff, and David Zeile.

Before: MICHAEL J. KELLY, P.J., and WEAVER and D. E. SHELTON,* JJ.

WEAVER, J. Plaintiff brought suit against defendants, twelve pharmacies and twenty-two pharmacists, alleging that defendants repeatedly sold Schedule V (21 USC 812), nonprescription, codeine-based cough syrup to plaintiff, perpetuating his preexisting substance abuse problem. Plaintiff alleged defendants' repeated cough syrup sales to him constituted negligence and a breach of the professional standard defendants owed him. Defendants collectively moved for summary disposition under both MCR 2.116(C)(8) and MCR 2.116(C)(10). The trial court granted defendants' motion for summary disposition under MCR 2.116(C)(8), stating that they owed no duty to identify an addicted customer and then refuse to sell him a controlled substance. Plaintiff now appeals as of right. We affirm.

Plaintiff asserts that the pharmacists owed him the duty to refrain from dispensing to him Schedule V, nonprescription controlled substances. We disagree. The claim is so clearly unenforceable as a matter of law that no factual development could possibly justify a right of recovery. *Wade v Dep't of Corrections,* 439 Mich 158; 483 NW2d 26 (1992).

This Court has previously rejected the theory that a pharmacist owes a customer a legal duty to monitor drug usage. *Adkins v Mong,* 168 Mich App 726; 425 NW2d 151 (1988). We find the pharmacists owed no duty to plaintiff to discover his addicted status; failing knowledge of that, they had no duty to refuse to sell to him.

Affirmed.

MICHAEL J. KELLY, P.J., concurred.

* Circuit judge, sitting on the Court of Appeals by assignment.

D. E. SHELTON, J. *(dissenting).* I dissent.

This case presents an issue of first impression in this state: Does a pharmacist owe any actionable duty of care to persons to whom nonprescription controlled substances are dispensed? The trial court granted defendants' motion for summary disposition under MCR 2.116(C)(8) and held that no such duty exists. I disagree and would reverse.

Plaintiff is afflicted with a chronic chemical dependency. He has participated in several treatment programs, but each time resumed his addiction by purchasing and consuming vast amounts of Schedule V (21 USC 812), codeine medications from defendants. In his complaint, he alleged that each of the pharmacists dispensed the addictive substances in violation of several specific control requirements of statutes, administrative regulations, and published ethical standards. The complaint, which included counts of general negligence and professional malpractice, alleged that as a proximate result of the sale of these drugs, plaintiff "developed and furthered a dependency and addiction to codeine and other controlled substances."

A motion under MCR 2.116(C)(8) tests the legal sufficiency of a complaint, considering only the pleadings. *Royal Palace Homes, Inc v Channel 7 of Detroit, Inc,* 197 Mich App 48, 51; 495 NW2d 392 (1992). All well-pleaded allegations are accepted as true and are to be considered in a light most favorable to the nonmoving party. *Id.* A court should grant summary disposition under this section only where the claims are so clearly unenforceable as a matter of law that no factual development could justify recovery. *Id.* Summary disposition is proper under these circumstances only if it is determined, as a matter of law, that defendants owed no duty to plaintiff. *Abel v Eli Lilly &*

*Co,* 418 Mich 311; 343 NW2d 164 (1984), reh den
419 Mich 1201 (1984), cert den sub nom *E R
Squibb & Sons, Inc v Abel,* 469 US 833 (1984);
*Terrell v LBJ Electronics,* 188 Mich App 717, 719;
470 NW2d 98 (1991). The issue before this Court is
thus clearly framed: Does a pharmacist who dis-
penses controlled, addictive, nonprescription drugs
in violation of applicable statutes, regulations, and
professional standards owe an actionable legal
duty to a customer who develops or furthers an
addiction resulting from those drugs?

The existence of an actionable duty is a question
that ultimately depends upon, and must reflect,
the public policy of the state with regard to the
obligations of the group in which the actor is
included toward the group in which the injured
person is included. Our Supreme Court stated the
principle simply in *Moning v Alfono,* 400 Mich
425, 438-439; 254 NW2d 759 (1977):

> Duty is essentially a question of whether the
> relationship between the actor and the injured
> person gives rise to any legal obligation on the
> actor's part for the benefit of the injured person.

and again in *Friedman v Dozorc,* 412 Mich 1, 22;
312 NW2d 585 (1981):

> In a negligence action the question whether the
> defendant owes an actionable legal duty to the
> plaintiff is one of law which the court decides after
> assessing the competing policy considerations for
> and against recognizing the asserted duty.

This Court has addressed the issue of duty in
similar language:

> Duty has been defined as an "obligation, to
> which the law will give recognition and effect, to

conform to a particular standard of conduct to-
wards another." *Schanz v New Hampshire Ins Co,*
165 Mich App 395, 402; 418 NW2d 478 (1988). . . .
The question of duty is one solely for the court to
decide, with the essential question being whether
the relationship between the actor and the injured
person gives rise to any legal obligation on the
actor's part for the benefit of the injured person.
[*Horn v Arco Petroleum Co,* 170 Mich App 390,
392; 427 NW2d 582 (1988).]

And Dean Prosser succinctly characterized the
court's role when he stated:

[Duty] is not sacrosanct in itself, but is only an
expression of the sum total of those considerations
of policy which lead the law to say that the
particular plaintiff is entitled to protection. [Pros-
ser & Keeton, Torts (5th ed), § 53, p 358.]

We often look to statutes and regulations as
primary evidence of public policy. As stated in
*Clark v Dalman,* 379 Mich 251, 260-261; 150 NW2d
755 (1967):

Actionable negligence presupposes the existence
of a legal relationship between parties by which
the injured party is owed a duty by the other, and
such duty must be imposed by law. The duty may
arise specifically by mandate of statute, or it may
arise generally by operation of law under applica-
tion of the basic rule of common law . . . .
Such duty of care may be a specific duty owing
to the plaintiff by the defendant, or it may be a
general one owed by the defendant to the public,
of which the plaintiff is a part.

See also *Douglas v Edgewater Park Co,* 369 Mich
320; 119 NW2d 567 (1963).
The policy of this state in particular and the
nation in general toward those who sell and dis-

pense nonprescription controlled substances is made clear by a myriad of statutes and regulations. Congress recognized the double-edged sword of some addictive drugs when it established the national scheme for categorizing, or "scheduling," such chemicals and determining that the government would control their manufacture, distribution, and use. That statutory scheme is prefaced by the following language of 21 USC 801:

> The Congress makes the following findings and declarations:
> (1) Many of the drugs included within this subchapter have a useful and legitimate medical purpose and are necessary to maintain the health and welfare of the American people.
> (2) The illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people.

Some controlled substances are so dangerous that they may not be used, or even possessed, by anyone. Many others have such addictive potential that only a licensed physician, whose activities presumably may be regulated and reviewed, is the designated "gatekeeper" for such drugs and a medical prescription is therefore the control mechanism. (Even then, the prescriptions for such substances are the subject of special controlling statutes and regulations.) Many other controlled substances have such an addictive potential that, while no prescription is required, they may only be dispensed by a licensed pharmacist, whose activities are subject to similar controlling statutory and regulatory procedures. Schedule V controlled substances are in the latter category, and pharmacists are the nation's "gatekeepers" for those chemicals.

Our state's public policy determination to strictly control the dispensation of Schedule V substances is born of a well-founded fear of their addictive potential and is reflected in the following state statutes and regulations:

A controlled substance included in schedule 5 shall not be distributed or dispensed other than for a medical purpose, or in any manner except in accordance with rules promulgated by the administrator. [MCL 333.7333(5); MSA 14.15(7333)(5).]

A practitioner [pharmacist] licensed by the administrator under this article shall not dispense, prescribe, or administer a controlled substance for other than legitimate and professionally recognized therapeutic or scientific purposes or outside the scope of practice of the practitioner, licensee, or applicant. [MCL 333.7401(1); MSA 14.15(7401) (1).]

The person to whom a pharmacy license is issued and the pharmacists on duty are responsible for compliance with federal and state laws regulating the distribution of drugs and the practice of pharmacy. [MCL 333.17741(2); MSA 14.15(17741)(2).]

[N]or shall a controlled substance be dispensed or administered to a drug dependent person for the purpose of continuing his drug dependency. [1979 AC, R 338.3163.]

Furthermore, Michigan administrative rules regulate the dispensation of Schedule V controlled substances in the following manner:[1]

(1) A pharmacist . . . may, without a prescrip-

---

[1] These regulations are, in large measure, the counterpart of federal Drug Enforcement Administration regulations contained in 21 CFR 1301 *et seq.*

tion, dispense a controlled substance listed in schedule 5 . . . to an ultimate user if all of the following provisions are complied with:

(a) The dispensing is for a medical purpose.

(b) Not more than 240 cc (8 ounces) or 48 solid doses . . . is distributed at retail to the same purchaser in any single 48-hour period.

(c) The purchaser is not less than 18 years of age.

(d) The pharmacist . . . requires a purchaser not known to the pharmacist . . . to furnish suitable identification, including proof of age where appropriate.

(2) When a pharmacist . . . dispenses a controlled substance listed in schedule 5, he or she shall affix to the container in which the substance is dispensed a label showing the date, his or her own name, and the name and address of the place of practice in which the substance is dispensed.

(3) A bound record book of the dispensing of controlled substances listed in schedule 5 other than by prescription shall be maintained by the pharmacist . . . . The book shall contain all of the following information:

(a) The name and address of the purchaser.

(b) The name and quantity of substance purchased.

(c) The date purchased.

(d) The name or initials of the pharmacist . . . who dispensed the substance. [1982 AACS, R 338.3167.[2]]

_____

[2] The Board of Pharmacy has proposed revisions of this rule that would further control the dispensation of Schedule V substances. The proposed changes reflect the public concern over precisely the type of injury alleged by plaintiff in this case. The proposal would additionally require that "not more than 120 cc (4 ounces) or 24 solid doses of any other substance listed in schedule 5 is distributed at retail to the same purchaser in any single 96-hour period and not more than 240 cc (8 ounces) or 48 solid doses of the same substance is distributed to the same purchaser over 60 consecutive days." See 1992 MR 39, R 338.3167. It would also tighten identification procedures, require the pharmacist to state the reason given by the purchaser for the purchase, and mandate a monitoring and quarterly reporting system for such sales.

Plaintiff in this case specifically alleged that defendant pharmacists violated these and other statutes and regulations, and we must assume those allegations to be true for purposes of this appeal.

The array of controls and regulations is the best evidence of the obvious public policy in favor of controlling the distribution of Schedule V drugs. The existence of such controls is based upon the premise that persons may not be able to control their behavior when using such drugs or after becoming chemically dependent upon them. It is a recognition that those who are allowed to dispense such dangerous chemicals have a special obligation both to the public in general and to the purchasers in particular. The primary control mechanism for these drugs is to limit their legal distribution to licensed pharmacists and then impose special obligations on those pharmacists when dispensing such substances. Clearly, as the selected "gatekeeper" of such necessary, but potentially harmful Schedule V drugs, a pharmacist has a duty to the consumer to dispense such drugs with reasonable care and in accordance with all applicable statutes and regulations.

I also believe that the duty of pharmacists with regard to Schedule V substances arises from the nature of the pharmacist-patient relationship in this setting. Plaintiff in this case alleged that defendants' conduct violated the general standard of practice for pharmacists, as well as specific provisions of the applicable American Pharmaceutical Association Code of Ethics, and offered to produce the expert testimony required to establish such professional negligence. For purposes of a motion under MCR 2.116(C)(8), we must also assume that his allegation in this regard is true. Our Courts have consistently held that a physician's duty to a patient arises from the very nature of

the physician-patient relationship and the fact that the patient consults a physician for care. *Hill v Kokosky,* 186 Mich App 300, 302-303; 463 NW2d 265 (1990); *Rogers v Horvath,* 65 Mich App 644, 647; 237 NW2d 595 (1975). Pharmacists are considered health care providers for the purposes of our malpractice statutes. See MCL 600.2912; MSA 27A.2912 (authorizing a malpractice claim against any state-licensed professional); MCL 500.3051(c); MSA 24.13051(c) (including pharmacists within the definition of "health care provider" for purposes of the medical malpractice insurance laws under the Insurance Code). Thus, they owe a duty of care imposed upon them by the nature of their relationship with their patient. The patient who comes to a pharmacist for a Schedule V controlled substance is there for care and is there because our law provides that the only place the patient can obtain care in that form is from a licensed pharmacist. When the law bestows such a monopoly of care on a health professional, public policy and the common law require that the professional exercise that entrusted responsibility with the care common to the profession and be responsible for the consequences of a failure to do so.

The majority's almost cavalier reliance on *Adkins v Mong,* 168 Mich App 726; 425 NW2d 151 (1988), is misplaced. That case does not involve a blanket rejection of "the theory that a pharmacist owes the customer a legal duty to monitor drug usage." In that case, the Court addressed the responsibilities of a pharmacist when filling a prescription from a licensed physician. The Court held that the duty to warn the patient of possible side effects of a prescribed medication lies with the prescribing physician and not with the dispensing pharmacist. In the case of prescription medications, it is the physician who stands as the "gate-

keeper" between the patient and medically necessary, but potentially harmful, drugs. For Schedule V controlled substances, only the pharmacist stands as the "gatekeeper" between the patient and such potentially harmful drugs.

The holding of *Adkins* is indeed consistent with a finding that the entrustment of the "gatekeeping" power carries with it a duty of reasonable care. With regard to Schedule V substances, if this Court does not recognize a duty of care by the pharmacist to the patient, then no one in the health care system will have any responsibility to the patient for the distribution of such addictive chemicals. The problems of chemical dependence in this state, and throughout this nation, are too severe and widespread to countenance such a result. Judges deal with the effects of such abuse every day. Perhaps more than many others, judges should see the urgent need to require the responsible dispensation of such socially and economically dangerous drugs. The public policy considerations, which are, as Dean Prosser concluded, paramount to the question of legal duty [see Prosser, *supra* at 358], require a recognition of the responsibility of pharmacists to their patients in the dispensing of such otherwise uncontrolled addictive drugs.[3]

Defendants also urge us to affirm the summary disposition of plaintiff's complaint on a ground not stated by the trial court. They assert that the "wrongful conduct" of plaintiff bars any recovery under the maxims of in pari delicto and violenti non fit injuria. Although the cursory majority opinion does not specifically refer to these defen-

---

[3] It is not clear even from the brief majority opinion that a pharmacist owes *no* duty to the patient in the distribution of Schedule V controlled substances. The majority seems to hold only that a pharmacist who does not know that the patient is addicted has "no duty to refuse to sell to him." Presumably, a pharmacist who does know of such an addiction would have a legal duty to the patient.

ses, the underlying tenet of defendants' arguments is that addiction is simply a wilful act by a weak person. These defenses are not properly before this Court because they raise factual matters particular to this plaintiff that may be the subject of a motion for summary disposition under MCR 2.116(C)(10). The trial court did not rule upon such a motion. Such allegations of misconduct by plaintiff are properly treated as matters of comparative negligence under our system. See Prosser, *supra,* § 36, pp 232-233; Woods, Comparative Fault (2d ed), § 10:5, p 212; Schwartz, Comparative Negligence (2d ed), § 6.3, p 122. More basically, however, defendants' claim in this regard, and the majority's holding, evidence a basic lack of comprehension of the nature of addictive drugs and chemical dependency.

The reason our society controls and limits access to addictive drugs is that they deprive a person of the ability to make rational choices or to exercise good judgment, and therefore make that person a danger both to himself and to the public at large. A person who is under the influence of such a chemical is, by definition, not capable of deciding to stop consuming the drug. The admonition to "just say no" has meaning only to those who are not already under the addictive influence of a chemical. The admonition is irrelevant to a person who has already lost the cognitive ability to say anything other than "I need more." That is the nature of the chemical that makes it so dangerous and so in need of regulation and control by professionals who are responsible for its dispensation. It is especially dangerous when it is available, and necessary, as medication. In those instances, our society does not say "just say no," but rather, it loudly urges the public, in advertisement and otherwise, to say "yes" for relief of even minor or

common ailments. To say that a dispenser of drugs to a member of the public who has thereby lost the power to make rational choices has no public responsibility because the consumer has become addicted is the cruelest of non sequiturs.