Jerrilyn HUNLEY and Jerome
J.D. Hunley, Plaintiffs,

v.

DuPONT AUTOMOTIVE, Defendant.

No. 00–72043.

United States District Court,
E.D. Michigan,
Southern Division.

Nov. 28, 2001.

See also 2000 WL 33419389.

Patrick D. Ball, Martin, Bell, Mount Clemens, MI, Donnelly W. Hadden, Bettie K. Ball, Ann Arbor, MI, for plaintiffs.

Robert S. Krause, Dickinson Wright, Detroit, MI, for defendant.

## OPINION & ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

EDMUNDS, District Judge.

This matter comes before the Court on Defendant's motion for summary judgment. For the reasons set forth below, Defendant's motion for summary judgment is GRANTED.

## I. Facts

This is a negligence action arising out of a paint spill that occurred on Monday, January 27, 1997 at Defendant DuPont Automotive's ("Defendant" or "DuPont") Mount Clemens paint manufacturing facility. A DuPont employee, Marcie Attana-sio, was in the process of filling a tote (shipping container) with dark blue paint to ship to an automobile manufacturer. As she was moving the tote toward holding tank FT–74, which was suspended from the ceiling of the production area of the plant, Ms. Attanasio struck the bottom of the tank with the top of the tote dislodging the filling valve of the tank. In approximately 2–3 minutes, the tank emptied its 2400 gallons of dark blue paint onto Ms. Attanasio and the surrounding work area.

Plaintiff Jerome Hunley ("Plaintiff") was employed at the Mount Clemens facility as a Pinkerton security guard at the time of the spill.[1] In the event of a spill, Pinkerton security personnel in the guardhouse were instructed to hit the F9 key on a computer terminal to generate a series of head count reports so that the Incident Command Leader could verify that everyone in the plant was accounted for. The policies and procedures in place at the time specifically prohibited Pinkerton security guards from entering a spill area. *See* Pinkerton Site Post Orders attached as Defendant's exhibit I; Deposition of William Maynard at pages 11–12 attached as Defendant's exhibit J; Deposition of Ginger Cooper at page 45 attached as Defendant's exhibit K. Plaintiff claims that despite standard operating procedure, he was sent into the spill area by Bill Maynard, the Pinkerton supervisor, to deliver the head count sheet to the fire brigade chief. *See* Deposition of Jerome Hunley at page 68 attached as Defendant's exhibit H. Defendant disputes this allegation and argues that Plaintiff has no evidence, other than his own testimony, that he was near the spill site.[2]

---

1. This lawsuit was filed by Jerome Hunley's mother, Jerrilyn Hunley, on behalf of Jerome Hunley. This memorandum uses the singular term "Plaintiff" when referring to Mr. Hunley individually, and the plural term "Plaintiffs" when referring to legal claims asserted.

2. To bolster its argument, Defendant points to Plaintiff's own testimony, which indicates that

Two days after the paint spill, Plaintiff was involved in a car crash that resulted in the death of a nineteen year old woman. Plaintiff was driving his pickup truck at speeds estimated at sixty to eighty miles an hour, against rush hour traffic, on Squirrel Road in Troy, MI. Plaintiff's truck became airborne and landed on the car of the nineteen year old woman, who was pronounced dead at the scene.

Plaintiff was acting bizarrely at the scene of the accident—removing his clothing, yelling about chemical contamination, and making irrational statements. He was transported to nearby Beaumont hospital, where he was diagnosed initially with brief reactive psychosis, a temporary diagnosis used to explain his acute psychotic symptoms. *See* Deposition of Dr. Charles Clark at pages 40, 46 attached as Defendant's exhibit A. After the accident, Plaintiff told police and interviewing psychiatrists that before driving his car through the congested roadway he was hearing voices and "seeing people hanging upside down." Witnesses to Plaintiff's rampage described him as "having a far off look in his eyes," "as if he were in a trance," "smiling," "evil" and "possessed."

Prior to the automobile accident, Plaintiff had no recorded history of mental illness and no criminal record; he was 24 years old. After a series of mental evaluations following the accident, Plaintiff was ultimately diagnosed with schizophrenia—an organic mental disease that typically manifests itself when its victims are in their late teens to early twenties—and suffering at the time of the accident from an

acute psychotic break manifested by auditory and visual hallucinations. *See* Report of Dr. Gerald Shiner, M.D. attached as Defendant's exhibit B. Following a one year hospitalization, Plaintiff was tried and convicted of manslaughter but mentally ill. He is currently incarcerated at the Crane Correctional Facility in Coldwater, Michigan, serving a term of 4 to 15 years.

Plaintiffs filed this action against DuPont alleging that Mr Hunley's schizophrenia was caused by exposure to the paint spill. Plaintiffs base this claim primarily on a report given by Dr. Gerald Shiener, M.D., which states:

> Given the suddenness in the onset of this young man's symptomology and the onset of symptoms immediately following the incident of the spill, where the patient was exposed to an area in which all of the other employees had very striking obvious presence of protective clothing and gear that would indicate that he was in an area of danger or risk, I would conclude that it was the experience of exposure to these factors that caused him to become psychotic.

Report of Dr. Shiener at page 10
attached as Defendant's
exhibit B.

The above statement by Dr. Shiener explicitly remarks as to the "suddenness in the onset" of Plaintiff's psychotic symptoms, thus concluding that the paint spill directly precipitated Plaintiff's illness. However, other testimony and documentary evidence indicates that Plaintiff was suffering from "prodromal" symptoms or warning signs prior to the paint spill.[3]

he not did arrive at work until 9:45 p.m.–10:00 p.m. The spill occurred at 9:34 p.m., and the head count was complete within nine minutes of the spill. Defendant thus argues that by 9:43 p.m., two minutes before Plaintiff even claims he was on the site, the head count sheets had been delivered. Therefore, Plain-

tiff could not have been physically exposed to the spill site. *See* Hunley Deposition at page 8; Maynard Deposition at page 7; Report of Dr. Haynes attached as Defendant's exhibit L.

3. Dr Shiener describes prodromal symptoms as follows: "Schizophrenia is an illness that typically begins in adolescence or early adult-

Prior to the paint spill, Plaintiff suffered a drastic decline in his grades and ultimately withdrew as a student from Wayne State University. *See* Deposition of Dr. Charles Clark at 14, 34–35 attached as Defendant's exhibit A. Plaintiff's medical records suggest that he was unable to make and sustain any type of significant social relationships in the years preceding the paint spill. *Id.* at 13–14, 23–24. Plaintiff's co-workers testified that Plaintiff was known as a recluse, and more withdrawn and depressed than usual in the days prior to the spill. *See* Deposition of Ginger Cooper at pages 9–10 attached as Defendant's exhibit K. Specifically, Ms. Cooper testified:

Q: Some days prior to the spill did you observe Jerome acting bizarrely or strangely?

A: Yes.

Q: And can you tell us what that behavior by Jerome consisted of?

A: He said that there were demons in books and he had to get rid of the books, he couldn't read them because demons could come out.

Q: And did he, other than saying that there were demons in the books, did he behave peculiarly over and above that?

A: Yeah, he was just strange, his behavior. He never talked a whole lot, then he got a whole lot quieter and the things he would say were very erratic.

Q: And how did he look when he was telling you about the demons in the books and couldn't read the books because of the demons in them?

A: He had a far off look in his eye. It's hard to explain. But when you look at someone, you know something is wrong. He had a glare, like he wasn't there. His eyes were glossed—not like he had a buzz or anything, just like he wasn't there. His eyes didn't look right.

Cooper Deposition at page 9–10.

When questioned about the relevance of Ms. Cooper's testimony, Dr. Shiener stated:

When we talk about the issue of demons and throwing away books in a young man who comes from a fundamentally religious family and who's very involved with his family and involved with his church, I wouldn't tend to consider that to be all that inconsistent. I wouldn't tend to, I would interpret that by saying one swallow does not a spring make.

Shiener Deposition at page 36.

Thus, there appears to be a genuine issue of material fact concerning the onset of Plaintiff's mental illness.

As mentioned earlier, Plaintiff is currently incarcerated. His schizophrenia has been in a state of remission induced by anti-psychotic medication since the inception of this lawsuit, and he has clear thought processes, unlike his initial "grossly psychotic" state. *See* Deposition of Dr. Clark at page 36 attached as Defendant's exhibit A.

## II. Analysis

■■■ To establish a prima facie case of negligence, Plaintiff must establish and prove four elements: (1) Defendant owed a duty to Plaintiff to conform its conduct to a

hood. It is frequently proceeded by a period of subtle behavioral symptoms of social withdrawal, moodiness, memory and concentration difficulties, and newly emerging unusual beliefs or perceptual alterations that do not amount to full-blown delusions or hallucinations." Shiener report at page 9 attached as Defendant's exhibit B.

standard necessary to avoid an unreasonable risk of harm to others; (2) Defendant breached that duty falling below the standard of care set by the law; (3) Defendant's failure to meet the applicable standard of care was causally connected to Plaintiff's harm i.e., cause in fact and proximate (legal) cause; and (4) damages to Plaintiff. *See Jackson v. Oliver*, 204 Mich. App. 122, 125, 514 N.W.2d 195 (1994). While the Court decides questions of duty, general standard of care and proximate (legal) cause, the jury decides whether there is cause in fact and decides the specific standard of care-whether Defendant's conduct is below the general standard of care. *See Moning v. Alfono*, 400 Mich. 425, 254 N.W.2d 759, 764 (1977).

In the present case, Plaintiffs meet their burden on the duty element; however, Plaintiffs fail to present sufficient evidence to create a genuine issue of material fact on whether Defendant breached that duty. Therefore, Defendant's motion for summary judgment is GRANTED, and Plaintiff's complaint is DISMISSED.

The Court also harbors doubt as to whether Plaintiff can overcome a motion for summary judgment on the issue of causation. However, since this opinion grants Defendant's motion for summary judgment on the issue of breach, the Court does not reach the issue of causation.

### A. Standard for Summary Judgment

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* FED.R.CIV.P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202

(1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. 2505.

The court must believe the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See id.* at 255, 106 S.Ct. 2505. The inquiry is whether the evidence presented is such that a jury applying the relevant evidentiary standard could "reasonably find for either the plaintiff or the defendant." *See id.*

### B. Duty

■ The existence of a legal duty is essential to a prima facie case for negligence. *See Schneider v. Nectarine Ballroom, Inc.*, 204 Mich.App. 1, 514 N.W.2d 486, 487 (1994). Defendant argues that it owed no legal duty to protect Plaintiff from the unforeseeable consequences of the paint spill. Defendant bases its argument on the axiom that no legal duty is owed to the unforeseeable plaintiff. *See, generally, Palsgraf v. Long Island Rail-*

*road Co.*, 248 N.Y. 339, 162 N.E. 99 (1928). However, the *Palsgraf* unforeseeable plaintiff is not at issue in the present case. Mr. Hunley, as a contracted security guard for DuPont, was a foreseeable plaintiff who could be injured by a paint spill.

■ The Court finds that Defendant frames the issue of duty too narrowly.[4] " 'Duty' comprehends whether the defendant is under any obligation to the plaintiff to avoid negligent conduct; it does not include where there is an obligation the nature of the obligation: the general standard of care and the specific standard of care." *Moning, supra* at 764. Thus the duty question becomes simply whether DuPont owes any legal obligation to protect its contracted security guards from paint spills; the Court concludes that DuPont had such a duty. Whether DuPont breached that duty, or whether Plaintiff's injuries actually occurred as a result of that spill involves a separate inquiry.

### C. Breach of Duty

■ As stated earlier, the Court determines what the general standard of care is while the jury decides the specific standard of care. This division of labor remains intact unless the Court is of the opinion that (1) all reasonable persons would agree or (2) there is a legislatively or judicially declared public policy whether the risk of harm created by the defendant's conduct is or is not reasonable. *See Moning, supra* at 764.

### 1. General & Specific Standards of Care

■ Plaintiff, as a private security guard, was an invitee in Defendant's plant. *See, generally, Hewett v. First National Bank of Atlanta*, 155 Ga.App. 773, 272 S.E.2d 744 (1980)(Wells Fargo security guard held to be an invitee of the bank he was contracted to guard). While premises owners have a duty to invitees, that duty is not absolute; the standard of care does not extend to protecting from conditions from which an unreasonable risk cannot be anticipated. *See Williams v. Cunningham Drug Stores, Inc.*, 429 Mich. 495 (1988). Under *Bertrand v. Alan Ford, Inc.*, 449 Mich. 606, 609, 537 N.W.2d 185 (1995), a premises owner must warn invitees against danger only if the danger was actually known of or, by the exercise of reasonable care, should have known to pose an unreasonable risk to the invitee.

■ Defendants are not charged with warning of unforeseeable dangers. *See Stabnick v. Williams Patrol Service*, 151 Mich.App. 331, 334, 390 N.W.2d 657 (1986). It is well settled that reasonable

---

**4.** "It is quite possible, and not at all uncommon, to deal with most of the questions which arise in a negligence case in terms of 'duty.' Thus the standard of conduct required of the individual may be expressed by saying that the driver of an automobile approaching an intersection is under a duty to moderate his speed, to keep a proper lookout, or to blow his horn, but that he is not under a duty to take precautions against the unexpected explosion of a manhole cover in the street. But the problems of 'duty' are sufficiently complex without subdividing it in this manner to cover an endless series of details of conduct. It is better to reserve 'duty' for the problem of the relation between individuals which imposes upon one a legal obligation for the benefit of the other, and to deal with particular conduct in terms of a legal standard of what is required to meet the obligation. In other words, 'duty' is a question of whether the defendant is under any obligation for the benefit of the particular plaintiff; and in negligence cases, the duty is always the same, to conform to the legal standard of reasonable conduct in the light of the apparent risk. What the defendant must do, or must not do, is a question of the standard of conduct required to satisfy the duty." *Moning, supra*, at 764 quoting Prosser, Torts (4th ed.), § 53, p. 324.

care under the circumstances represents a sliding scale. *See Case v. Consumers Power Company,* 463 Mich. 1, 615 N.W.2d 17 (2000). "The more severe the potential injury, the more resources a reasonable person will expend to try and prevent that injury. Similarly, the greater the likelihood that a severe injury will result, the greater that lengths a reasonable person will go to prevent it." *Id.* at 21.

 It is neither foreseeable that witnessing an emergency response to a paint spill could cause a psychotic episode, nor is it in the interest of public policy to charge factory owners with protecting against such injuries. Pinkerton security guards were specifically forbidden from entering a spill area, this policy alone is adequate protect against the type of harms that could befall a security guard due to a paint spill.

 Nor does Plaintiff present a viable claim based on the failure to provide protective gear. As evidenced from the above cited cases, Defendant's duty to provide its employees protective gear stems from a duty to protect from known risks. In the realm of known risks associated with a paint spill, the development of schizophrenia from the stress of the incident is not one that this Court will charge DuPont with guarding against. The personnel charged with cleaning up the paint spill area were issued protective gear to guard against known risks. One does not typically associate schizophrenia with the risks attendant in a paint spill cleanup operation, and Plaintiffs provide the Court with no evidence to suggest otherwise. Thus, the Court finds that DuPont did not breach its duty by failing to provide Plaintiff with protective gear to protect him from developing schizophrenia.

## 2. "Assumption of the Risk"

This Court also finds the reasoning of *In re Air Crash Disaster at Detroit Metropolitan Airport on August 16, 1987,* 737 F.Supp. 409 (E.D.Mich.1989) applicable to the present case. *In re Air Crash* involved private security guards who were dispatched to the site of the crash of Northwest Flight 255 in order to secure the area from spectators, news media and the general public. The security guards subsequently filed lawsuits against Northwest alleging that they were required to maintain their posts for over five hours, during which time their responsibilities included the gathering and identification of bodies and body parts. The guards contended that these duties caused each of them to "sustain psychological and emotional injuries, incur medical expenses for counseling and hospitalization, and suffer lost wages and the diminution of their respective earning capacities." *Id.* at 410.

*In re Air Crash* adopted the reasoning of *Carter v. Mercury Theater Company,* 146 Mich.App. 165, 379 N.W.2d 409 (1985) and *Turner v. Northwest General Hospital,* 97 Mich.App. 1, 293 N.W.2d 713 (1980). In *Turner,* the defendant hospital hired a private security guard agency. The plaintiff, an employee of the agency, was shot and killed while guarding the hospital. The *Turner* Court stated:

In this case, defendant hospital, recognizing a need to safeguard, protect and secure its patients, visitors, doctors and business invitees, hired an independent security guard company for that purpose. What happened to plaintiff's decedent was the very reason plaintiff's decedent and his employer were hired i.e., to safeguard against criminal acts of violence. It would be ironic to hold defendant hospital liable to an employee of the very security guard company it hired for protection.

*Turner, supra,* at 713.

Based upon this reasoning, the Michigan Court of Appeals concluded that the defendant owed no duty to Turner and, therefore, could not be held liable for his death.

In *Carter,* the defendant, a theater owner, hired a security company, ACE Security Guard Service, to guard its property. On the night of the injury, plaintiff, an employee of ACE, evicted some patrons who had been disruptive. Those same patrons regained entrance, shot and paralyzed Carter. In his subsequently filed lawsuit against the property owner, he alleged that the patrons had regained entrance to the theater through a door with broken locks or by being readmitted by the defendant's employees who had been warned not to readmit him.

Even though *Carter* was not an employee of the theater owner, the Court did not allow him to recover based upon what appears to be an assumption of risk doctrine. Upon review, the Michigan Court of Appeals dismissed the action for failure to state a claim, concluding that the defendant "owed no duty to plaintiff ... to warn and protect him from the injury and violence which occurred...." *Carter v. Mercury Theater Co.,* supra, 146 Mich.App. at 167, 379 N.W.2d 409, quoting, *Turner, supra.*

■ Although neither *Turner* nor *Carter* specifically spoke of assumption of risk, the underlying reasoning of the decisions indicates that the defendant owed the plaintiff no duty because the claimed injury grew out of the exact danger against which the plaintiff was hired to protect. This is the same rationale behind the assumption of risk theory, that is:

... [it] is a term of the contract of employment, express or implied from the circumstances of the employment, by which the servant agrees that dangers of injury obviously incident to the discharge of the servant's duty shall be at the servant's risk. In such cases the acquiescence of the servant in the conduct of the master does not defeat a right of action on the ground that the servant causes or contributes to the cause of the injury, but ... no right of action arises in favor of the servant at all, for, under the terms of the employment, the master violates no legal duty to the servant in failing to protect him from dangers the risk of which he agreed expressly or impliedly to assume.

*Felgner v. Anderson,* 375 Mich. 23, 133 N.W.2d 136, n. 4 (1965).

■ The assumption of risk doctrine then provides that an employee assumes the risks of injury from ordinary activities. Thus, if there is no duty owing to be breached, there is no recovery available. In *Turner* and *Carter,* this doctrine was applied by the courts by determining whether the injury grew out of the very reason that the plaintiff was hired. *See, Turner, supra,* 97 Mich.App. at 3, 293 N.W.2d 713; *Carter, supra,* 146 Mich.App. at 167, 379 N.W.2d 409.

This Court agrees with *In re Air Crash* that the theory espoused by the Michigan Courts in *Carter* and *Turner,* whether properly termed assumption of risk or not, precludes Plaintiff from recovering in the present litigation. Although the assumption of risk doctrine appears to require the presence of an employer-employee relationship in order to preclude recovery, the *Carter* and *Turner* cases clearly establish that, under limited circumstances, a non-employee may be prevented from recovering if he/she is harmed by performing the very duty that he/she has been hired to perform.

■ In applying this doctrine to the present case, the Court finds that Plaintiff was undertaking duties that he was hired

to perform when his alleged injury occurred. Here, Plaintiff claims that he was required to deliver a head count report to the fire brigade chief. The Court finds that Plaintiff's alleged activities were part of the very duties that he was hired to perform. Therefore, Plaintiff cannot now sue DuPont for the psychological stress that he claims was caused by fulfilling his duties.

## III. Conclusion

For the reasons stated above, Defendant's motion for summary judgment is GRANTED.